# IN THE MATTER OF THE BERNICE P. BISHOP ESTATE.

## No. 2507.

ARGUED JULY 16-30, 1942, INCLUSIVE. DECIDED JULY 8, 1943.
SUBMITTED AUGUST 29, 1942.

KEMP, C. J., PETERS AND LE BARON, JJ.

404

OPINION OF KEMP, C. J.

This is an appeal by the attorney general from an order or decree approving accounts of the trustees under the will and of the estate of Bernice Pauahi Bishop, deceased.

The principal issue involves the challenged right of the trustees to employ others to perform services in the management of the properties of the trust at the expense of the trust other than services which are beyond the skill and experience of the ordinary trustee, and services which are menial.

The substance of the argument of the appellant is that since there is no provision in the will authorizing the trustees to employ others at the expense of the estate to assist them, the compensation provided by our statute (R. L. H. 1935, § 3793) is in full for the performance of all services necessary for the proper administration of the trust estate, except such as are beyond the skill of the ordinary trustee or are menial, and that to require the

estate to pay for such services would require it to pay twice for the same service. The appellant, therefore, argues that the trustees must either personally perform all such services or procure them to be performed without expense to the estate.

The pertinent provisions of section 3793, *supra*, follow: "Upon all moneys received in the nature of revenue or income of the estate, such as rents, interest and general profits, executors, administrators, trustees and guardians shall be allowed as commissions payable out of the income, ten per centum for the first thousand dollars, seven per centum for the next four thousand dollars, and five per centum for all over five thousand dollars, such commissions to be allowed upon each accounting when made but not oftener than once a year. * * * Such further allowances may be made as the court shall deem just and reasonable for special services. * * *

"Any * * * trustee * * * required by law or the order of any court or judge to give a bond or other obligation as such, may include as a part of the lawful and chargeable expense of executing his trust such reasonable sum, paid a company authorized under the laws of the Territory to become surety on such bond or obligation, for becoming his surety thereon, as may be allowed by the court in which, or a judge before whom, he is required to account, not exceeding one per centum per annum on the amount of such bond."

Ever since 1859 our statute has provided a mandatory graduated schedule of fees or compensation for executors, administrators and guardians. The decisions of this court allowing or disallowing such fiduciaries reimbursement of expenses incurred in administering their trusts therefore apply with equal force to trustees under the present statute.

The first statute on the subject is found in the Civil

Code of 1859, section 1281, which by its terms applied only to executors, administrators and guardians. The pertinent part of said section follows: *"Fees of Executors, Administrators and Guardians:*—For receiving and paying out moneys, ten cents for every dollar up to and not exceeding one thousand dollars; seven cents for every dollar over one thousand, up to and not exceeding five thousand dollars; five cents for every dollar over five thousand dollars; and such additional allowance for their actual expenses as the judge or court shall deem just and reasonable."

While the foregoing statute was in force and unamended, this court in *Hart* v. *Kapu*, 5 Haw. 196, on September 15, 1884, affirmed the decision of the chancellor rendered May 12, 1884, which announced the law to be that a trustee is entitled to reasonable compensation for his time and trouble and all proper expenses to keep up the estate. This in effect rejected the English common-law rule denying trustees compensation but followed the English common law which allowed trustees indemnity for all proper and necessary expenses incurred in the management of the trust property.

The authority cited for the foregoing holding was Perry on Trusts, sections 913 and 917. The statute fixing the compensation and expenses of executors, administrators and guardians was not referred to.

In *Estate of McBryde*, 8 Haw. 472, 477, 478, decided April 26, 1892, after the effective date of Act 98, hereinafter quoted, but involving transactions prior to said statute, this court, in denying compensation to the executors based on the income from a ranch and plantation, gave as its reasons the following: "For if the widow was entitled to the possession, there would be no commissions on account of the income, and if the executors were authorized to take possession and manage the property they have not

done so, but have allowed a business firm to attend to the financial management and have themselves handled no part of these receipts as executors. T. H. Davies & Co. have done the work and have doubtless charged and collected their compensation therefor. The executors, therefore, are not entitled to commissions, even if they had the right to receive the moneys." The court, limiting the application of the above, further said: "We do not go so far as to hold that trustees of this character may not hire clerks or business agents to assist in carrying on the business of the trust. This may be done in some circumstances, and often is inevitable, but where trustees abandon the whole management of the trust to others they may not claim commissions."

In 1892 the legislature, by Act 98, approved January 11, 1892, amended section 1281 of the Civil Code to read in part as follows: "FEES OF EXECUTORS, ADMINISTRATORS AND GUARDIANS.

"Executors, administrators and guardians shall be allowed the following commissions upon all moneys received and accounted for by them, that is to say: * * *

"Upon all moneys received in the nature of revenue or income of the estate, such as rents, interest and general profits, ten per centum for the first thousand dollars, seven per centum for the next four thousand dollars, and five per centum for all amounts over and above the first five thousand dollars."

It will be noted that this Act by its terms was confined to compensation of executors, administrators and guardians. All reference to expenses was omitted.

On March 9, 1901, while this statute was in force and unamended, *In re Estate of Lunalilo*, 13 Haw. 317, 318, was decided. This was apparently the first case involving the compensation of trustees to reach this court after the enactment of Act 98 in 1892. That case did not involve

the question of expenses but as to the compensation of trustees the court said: "We have no statute that prescribes the compensation of trustees, but we believe it has been the practice here, and as a rule, elsewhere, under similar circumstances, to follow in such cases the statutes which prescribe the fees of executors, administrators and guardians."

The language quoted implies that the 1892 statute had been applied by the courts in fixing the compensation of trustees ever since its passage. The practice described by the court was incorporated in the statute in 1927 and is now section 3793, relied upon by the attorney general in support of his contention that the trustees' compensation covers all services, other than professional and menial, as they find it necessary, for any reason, to employ others to perform.

*Estate of A. Enos*, 18 Haw. 542, 549, 550, decided January 8, 1908, involved expenditures by executors and trustees for clerical assistance to a master appointed to examine and report upon accounts of T. B. Lyons "as one of the executors and trustees under the will of Enos." It also involved expenditures by the executors to others for performing clerical services in assisting the temporary administrators and executors to discharge their duties, and payment of the premium on an administrator's bond. In disallowing the sums expended by the executors in paying for services employed by the temporary administrators, the court said:

"These amounts, if paid at all, should have been paid by the temporary administrators and not left to be dealt with by the executors who, as such, had nothing to do with them. The amount paid for the premium on a bond cannot under any circumstances be allowed. *Estate of Galbraith*, 18 Haw.—— The amount of $135 paid for clerical assistance to the master and temporary administrators

should be disallowed. We do not understand that under any circumstances an estate should pay for clerical assistance to help a master examine accounts. The amount paid for clerical assistance to the administrators was for making up their accounts, examining account books and reporting on an income tax statement. Recognizing that under certain circumstances clerical assistance for an administrator may be necessary and should be paid for by the estate, still the ordinary clerical work must be performed, or paid for, by the administrator himself. One who becomes an administrator must perform the ordinary work of such or else decline to be appointed. See *McBryde Estate*, 8 Haw. 472. In this case there was no reasonable necessity for employing outside clerical help, and consequently the amount paid therefor is disallowed. We are inclined to allow the other items if they are found to have been necessary and to be reasonable in amount. Commissions should not be charged on any of these amounts that may subsequently be allowed, either for receiving or paying out the same, as they should have been paid before the executors took hold."

As to the expense incurred by the executors, the court said: "The next item questioned is $35 paid to M. K. Keohokalole for services in assisting the executors in making out an inventory, opening a new set of books and adjusting transfers in the bank. As already pointed out, an executor may be allowed to credit himself with the amount paid out for necessary clerical assistance, but, as held in *Estate of Kaiu*, 17 Haw. 514, an expenditure not shown to have been reasonably necessary will be surcharged."

From the foregoing cases under the statutes fixing mandatory fees for executors and administrators, it appears that the question of the right of fiduciaries, whether an administrator or an executor, to employ others to assist in the discharge of their duties, turned on whether or

not such employment was necessary under the circumstances of the particular estate, notwithstanding the statute fixing mandatory fees for them. The question was never confused with the right of such fiduciaries to their statutory fees. In other words, if under the circumstances of the case it was necessary to employ assistance, the service was not deemed to be compensated for or covered by the statutory commissions. We conclude, therefore, that the former decisions of this court declaring that executors and administrators may be allowed to credit themselves with amounts paid out for necessary clerical assistance were made equally applicable to trustees by including them in the 1927 amendment. The question then is, what circumstances will render it necessary to employ others to assist the trustees in carrying out the trust? Webster's New International Dictionary defines "necessary" as "Essential to a desirable or projected end or condition; not to be dispensed with without loss, damage, inefficiency, or the like; * * * ." The desirable or projected end to be accomplished by the trustees of any estate is to make it productive of income. If the services of others cannot be dispensed with without loss, damage or inefficiency, they come within the definition above quoted.

The local authorities to which we have referred are also in harmony with the general rule on this subject, as shown by the following excerpts from some of. the leading authorities:

"The trustee can properly incur expenses which are necessary or appropriate for performing his duties as trustee. Thus, he can properly incur expenses necessary or appropriate to get in the trust property, or to preserve it, or to make the trust property productive, or to perform any other duties which he may have as trustee." Restatement, Trusts § 188, p. 491, Comment a.

"The trustee can properly incur expenses in employing

attorneys, brokers or other agents or servants so far as such employment is reasonably necessary in the administration of the trust. He cannot properly incur expenses, however, in employing agents to do acts which the trustee ought personally to perform, as where it would be an improper delegation of his duties or powers to act through an agent, or where although it would not be an improper delegation to employ an agent yet the service of the agent is one which is covered by the trustee's compensation." Restatement, Trusts § 188, p. 492, Comment c.

"It is the (general) rule that the trustee may incur expenses which are necessary and reasonable in carrying out the purposes of the trust. These necessary and reasonable expenditures, depending on circumstances, may include * * * the expenses of operating and managing the trust property * * *." 4 Pom. Eq. Jur. (5 ed.) § 1060c, pp. 162, 163.

"The disbursements that will be allowed to a trustee will depend very much upon the character of the trust and the directions given in the instrument of trust." 2 Perry, Trusts § 913, p. 1539.

"Trustees have an inherent equitable right to be reimbursed all expenses which they reasonably and properly incur in the execution of the trust, and it is immaterial that there are no provisions for such expenses in the instrument of trust." 2 Perry, Trusts § 910, p. 1473.

"A trustee may employ necessary assistants in executing the trust and pay them; thus he may employ agents, collectors, accountants, and other persons properly employed in similar affairs. [But he will not be reimbursed sums paid to others for services which he ought to have performed himself, such as keeping simple accounts.]" 2 Perry, Trusts § 912, p. 1538.

"A trustee can properly incur expenses in employing attorneys or brokers or other agents or servants so far as

412

such employment is reasonably necessary in the administration of the trust. He cannot, however, properly incur expenses in employing agents to do acts which he ought personally to perform. Thus if the trustee employs an agent to do acts which involve an improper delegation, not only may he incur a liability to the beneficiaries for so doing but he is not allowed a credit in his accounts for the expense of employing such agent. Even though the employment of an agent does not involve an improper delegation, he is not justified in charging the trust estate with payments made to the agent if the agent is employed to do acts which are covered by the trustee's compensation. Ordinarily the trustee is expected to keep his own accounts, and although it is proper for him to employ an accountant to assist him, he cannot ordinarily charge the trust estate with payments made to the accountant. In the case of large estates, however, it has been held not improper to employ an accountant or other agent to perform services which in the case of a smaller estate the trustee would be expected personally to perform." 2 Scott, Trusts § 188.3, pp. 1004, 1005.

"A trustee can properly incur expenses which are necessary or appropriate for the carrying out of the purposes of the trust. When such expenses are properly incurred, they should ultimately be borne by the trust estate rather than by the trustee personally. Although in England at common law trustees were not entitled to compensation for their services, they were allowed indemnity for expenses properly incurred by them. Under the English rule 'the trustee, though allowed nothing for his trouble, is allowed everything for necessary expenses in executing the trust. His duties relate to the property and interests of others, and he is to be indemnified for *necessary* expenses in protecting such trust property, and has an equitable lien upon it for such expenses.' In the United

States where trustees are entitled to compensation for their services they are also, of course, entitled to indemnity for expenses properly incurred by them in the administration of the trust. * * * He is entitled to indemnity for expenses incurred in the proper employment of agents and servants." 2 Scott, Trusts § 244, pp. 1406, 1407.

"The trustees of a charitable trust can properly incur expenses which are necessary or appropriate to carry out the purposes of the trust, and are entitled to indemnity out of the trust estate for such expenses." 3 Scott, Trusts § 380, p. 2043.

1 Perry, Trusts § 404, pp. 656, 657, cites cases holding that "necessity includes the usual course of business."

*Anderson* v. *Roberts*, 48 S. W. 847, 848 (Mo.), illustrates the application made of the foregoing conception of what necessity includes. There the court said: "Where the trust consists of a large number of houses, where the rents are small and payable monthly, the trustee could attend to the business himself; but it is not usual for owners to do so themselves, and trustees are not expected to. Or, if the trust consists of a cattle ranch, the trustees could feed and herd the cattle themselves, but it would be unreasonable to expect it. Or, where the trust consists of notes due from persons living in different states, the trustees could go to each state, and collect them, but it is not according to the usual course of business." See also *Donaldson* v. *Allen*, 182 Mo. 626, 81 S. W. 1151.

The argument of the attorney general is inconsistent with the foregoing statements of the general rules, as well as the decisions of this court, with the possible exception of the decision in *Estate of Mary E. Foster*, 34 Haw. 417, 418.

The decision in the *Foster* case being the principal authority relied upon by the attorney general in support of his argument that the compensation provided for trus-

414

tees by our statute provides full compensation for all necessary services, except such as are menial or beyond the skill and experience of an ordinary trustee, we shall now examine that decision to determine what it authoritatively decided. In order to make that determination, we must know what issue or issues confronted the court in that case. The court has stated what the issue was, as follows:

"The items for which the trustees claim reimbursement uniformly appear in the accounts rendered and filed and of which they prayed approval as a monthly salary paid to a 'bookkeeper.' * * * We shall confine ourselves therefore solely to the question of whether the monthly salary paid a third person employed as a 'bookkeeper' by the trustees continuously during the accounting period is an administrative expense for which the trustees are entitled to reimbursement out of the trust estate."

In view of the foregoing statement of the court, it is clear that no issue other than the right of the trustees of that trust estate to incur an administrative expense by employing a bookkeeper was authoritatively decided. The decision on the stated issue is in harmony with Scott's statement of the rule that "Ordinarily the trustee is expected to keep his own accounts, and although it is proper for him to employ an accountant to assist him, he cannot ordinarily charge the trust estate with payments made to the accountant." 2 Scott, Trusts § 188.3, *supra*. Following the foregoing, Scott states that "In the case of large estates, however, it has been held not improper to employ an accountant or other agent to perform services which in the case of a smaller estate the trustee would be expected personally to perform." There were no facts before the court in the *Foster* case calling for a decision on the effect which the size and character of the estate might have on the right of the trustees to employ bookkeepers.

As an additional justification of their right to incur the expense set up in the accounts now before us in employing others to assist them in the administration of the trust, the trustees have interposed a plea of *res judicata* based on an order or decree of the chancellor approving the 35th annual account in 1920.

It appears from the report of the master appointed to examine the 35th annual account that for the period covered by that account the trustees had employed bookkeepers and rent collectors at the expense of the estate and paid commissions for the collection of rentals made by others on various islands where estate lands are located. The master advised the chancellor that in her opinion the services performed by the employees in keeping the books and making collections were services which the trustees are required to perform or pay for themselves; that the duties required by law of a trustee include the keeping of accurate books of account and the collection of the revenues of the estate. As to the payment of premiums on bonds of employees, the master stated that such bonding is for the convenience and protection of the trustees rather than of the trust and should not be borne as an expense of management of the trust but should be borne by either the trustees or such employees.

To all of these recommendations of the master the trustees excepted and their exceptions were sustained, and the 35th annual account was approved as filed by order of the chancellor. No appeal was taken by the attorney general, the representative of the class of beneficiaries of the trust, although present and taking part in the hearing, and said order has not been otherwise modified or set aside.

The trustees have continued to employ bookkeepers and collectors at the expense of the estate and to pay premiums on the fidelity bonds of employees out of estate funds, and in the accounts now before us the master appointed to

416

examine and report on said accounts at first approved them and the chancellor entered an order approving them. Later, however, the chancellor revoked his order and instructed the master to re-examine said accounts and file a supplemental report covering the matter of expenses charged by the trustees for employees and to report whether any of them came within the provisions of the case of *Estate of Mary E. Foster*, 34 Haw. 417, *supra*. The order authorized the master to subpoena and swear witnesses and to employ a reporter. After an extended hearing, at which numerous witnesses were examined, the master filed his report and a transcript of the evidence adduced before him. He recommended that the trustees be surcharged all sums paid out by them in employing bookkeepers and collectors, and all premiums on fidelity bonds of employees as well as for salaries of various other employees. The trustees excepted to each and every recommendation of surcharge made by the master, and after an exhaustive hearing before the chancellor the accounts were again approved as filed and an order of approval entered. This appeal is from the order of the chancellor and is prosecuted by the attorney general in his capacity as *parens patriae*, who undertakes to justify every recommendation of the master.

*Res judicata* is twofold. The judgment of a court of competent jurisdiction is a bar to a new action in any court between the same parties or their privies concerning the same subject matter, and precludes the relitigation, not only of the issues which were actually litigated in the first action, but also of all grounds of claim and defense which might have been properly litigated in the first action but were not litigated or decided. Likewise, the adjudication by a court of competent jurisdiction of any right, fact or issue arising between the parties and actually litigated by them bars the relitigation between the same

parties or their privies in any court of the same right, fact or issue arising in any subsequent action or suit between the same parties or their privies, and this irrespective of whether the later action or suit relates to the same subject matter. (*Makainai* v. *Lalakea*, 29 Haw. 482.)

The Supreme Court of the United States has expressed the same doctrine in slightly different language in *Southern Pacific Railr'd* v. *United States*, 168 U. S. 1, 48, 49, as follows:

"The general principle announced in numerous cases is that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and even if the second suit is for a different cause of action, the right, question or fact once so determined must, as between the same parties or their privies, be taken as conclusively established, so long as the judgment in the first suit remains unmodified. This general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination. Its enforcement is essential to the maintenance of social order; for, the aid of judicial tribunals would not be invoked for the vindication of rights of person and property, if, as between parties and their privies, conclusiveness did not attend the judgments of such tribunals in respect of all matters properly put in issue and actually determined by them."

The governing principles to be applied when the defense of *res judicata*, or estoppel by judgment, is interposed are so clearly set forth by our own court and by the Supreme Court of the United States in the foregoing citations that further authority need not be cited here.

The pleadings in the proceedings for the settlement of

the 35th annual account consisted of the trustees' petition and the account filed with it, the report of the master thereon and the trustees' exceptions to the recommendations of the master. "The petition for an accounting and the objections thereto are pleadings similar to a complaint and an answer and they define the issues and limit the relief." *In re Doelger's Estate,* 4 N. Y. S. (2d) 334, 339. From the master's report and the exceptions thereto the issues or questions tried and decided by the chancellor are easily ascertained. As to bond premiums the master asserted that the bonding of employees is for the convenience and protection of the trustees rather than of the trust and should therefore be carried as a personal expense of either the trustees or the employees rather than as an expense of management of the trust. The exception of the trustees to this recommendation of the master put in issue the conclusion of the master and the facts upon which the conclusion was based, and the decree or order of the chancellor determined both. The trustees have continued to pay the premium on the bonds of employees out of estate funds under identical circumstances and the accounts now before us show a like expenditure, which the attorney general seeks to have surcharged.

As to the salaries and commissions paid to bookkeepers and collectors, the master questioned whether these charges, in addition to the statutory commissions allowed to trustees, are permissible. She asserted that the statutory commissions are intended as a reward for the services required of the trustees by the terms of the trust instrument or by law; that the duties required by law of trustees include the keeping of accurate books of account and the collection of the revenues of the estate; and if the trustees personally did the collecting of rents, or kept the books, there could be no claim to compensation aside from the commissions allowed by law. From the foregoing the

master drew the conclusion and asserted that the trustees must either perform such services or procure them to be performed without expense to the estate. The chancellor decided otherwise and the trustees have continued to employ bookkeepers and collectors, at the expense of the estate. In the accounts now before us the attorney general objects to the allowance of salaries of bookkeepers and collectors on the same grounds urged by the master in the hearing on the 35th annual account.

As to others employed and paid a commission on rents collected, the master reported that this practice is clearly not allowable, for the reason that the statute authorizes compensation to the trustees of ten per cent, seven per cent and five per cent on income collections, "for the performance of just such duties as these." The master advised the chancellor that the payment of commissions to others on rents collected by them "is an objectionable practice, in derogation of the terms and spirit of the statute, and should end." The exception of the trustees to this recommendation of the master was sustained.

In support of his contention that the doctrine of *res judicata* does not apply to disbursements for like services made subsequent to the order or decree relied upon as *res judicata,* the attorney general cites the following Hawaii cases: *In re Estate of Banning,* 9 Haw. 453; *Estate of A. Enos,* 18 Haw. 542; *Estate of D. H. Davis,* 22 Haw. 436; *Estate of Baker,* 34 Haw. 263, and *Estate of Allen,* 35 Haw. 501. Of these cases *Estate of Allen* is the only one in which the plea of *res judicata* was interposed. In that case the plea was based upon an order or decree approving an annual account. From the opinion of this court it appears that said estate owned various corporate shares on which the trustees received stock dividends which they retained as corpus. The first stock dividend was received August 15, 1916. The accounts of the trustees for the

period in which said stock dividend was received made no mention of said stock dividend. In examining the next annual account, the master discovered and called attention to the receipt by the trustees of the stock dividend and recommended that it be apportioned between capital and income, under the rules adopted in *Carter* v. *Crehore*, 12 Haw. 309, and *Evans* v. *Garvie*, 23 Haw. 651. Notwithstanding the master's recommendation, the accounts were approved and the trustees, in succeeding years down to 1935, received various other stock dividends from other corporations in which they owned stock, all of which they retained and treated as corpus. Finally, in 1936, the trustees being in doubt as to the correctness of their action, filed their bill for instructions, reciting the facts as to stock dividends and asking to be advised in what manner, if any, they shall readjust their accounts and apportion the stock dividends issued to them as such trustees since the death of the testatrix. There were two classes of beneficiaries — life tenants and remaindermen — all of whom were made parties respondent and participated in the hearing on the bill for instructions. Certain of the remaindermen set up the defense of *res judicata*, or estoppel by judgment, and relied upon the orders or decrees approving the accounts which disclosed the receipt of stock dividends. The chancellor rejected this plea but refused to follow the former decisions of this court and by decree advised the trustees that they had properly treated stock dividends. Certain of the respondents appealed to this court, and its opinion is relied upon by both parties to this case on the question of whether or not an order or decree approving an annual account can become *res judicata* or operate as an estoppel on a subsequent accounting as to an issue of law therein determined. In rejecting the plea of *res judicata*, which was renewed on appeal to support the decree, this court pointed out that in no instance when

the receipt of stock dividends was disclosed by the annual accounts of the trustees were the life tenants either present or represented at the hearing.

In discussing this issue this court said: "It is 'well settled that a fact or question in issue and litigated in a former action between parties is conclusively settled by the judgment therein and they are bound by the adjudication in another action between them.' * * * But an order or decree approving an annual trust account does not become *res adjudicata* as to matters not actually adjudicated by the court nor is it binding upon parties not duly notified and who do not participate in the proceedings."

We are unable to see that any of the Hawaii cases relied upon by the attorney general are in point, and we must look elsewhere for authority directly in point on the question now under consideration.

The attorney general relies upon the following cases from other jurisdictions: *In re Jackson's Will*, 258 N. Y. 281, 179 N. E. 496; *Parsons* v. *Lyman*, 32 Conn. 566, 18 Fed. Cas. 1263, and *Megrue* v. *Megrue*, 247 N. Y. S. 95.

The only one of these cases which tends to support the proposition for which they are cited is the case of *Megrue* v. *Megrue*. The will of Megrue devised 100 shares of the capital stock of the Standard Oil Company of New Jersey to his executor and trustee, the net income of which was to be paid to his wife for life with remainder to his son. By a codicil he expressly provided that should the said oil company make a stock dividend or increase its capitalization he gave such increase to his executor and trustee on the same trust, to be held by him as part of the principal of such trust, and directed that such increase, if any, should follow the original shares as finally disposed of. In 1915 a stock dividend was received by the trustee, and on his accounting a decree was entered by the surrogate's court on October 18, 1915, adjudging that to follow the

direction of the testator as to the disposition of said stock dividend, in so far as it represented profits since the death of the testator, would constitute an unlawful accumulation of income. An apportionment between principal and income was accordingly ordered. In 1931 another stock dividend having been received on said stock, the question of its disposition was before the court, and the effect of the decree of 1915 was considered. Said the court: "We are of the opinion that the decree of the Surrogate's Court of October 18, 1915, does not affect the question here for decision. The former decree of the Surrogate's Court was entered in an accounting proceeding upon objections to specific items in the executor's account." (p. 97.) The court further said: "The decree of the surrogate in the former accounting is res adjudicata only as to matters adjudicated in that accounting, and does not prevent the allocation to principal of the stock dividends as required by the will and codicil * * * ." (p. 99.)

On the question now under consideration, counsel for the trustees have cited *Gossom's Adm'r* v. *Gossom*, 133 S. W. 1162 (Ky.) ; *In re Leupp*, 153 Atl. 842 (N. J.), and *In re Lafferty's Estate*, 230 Pa. 496, 79 Atl. 712.

In the *Gossom* case the testator devised $3000 to one of his sons in trust for the support of an incompetent son of the testator. The trustee assumed that the will authorized the use of corpus for the support of said incompetent. In 1890, some nineteen years after the inception of the trust, the trustee having used approximately one half of the corpus in the support of the incompetent, filed a petition for the settlement of his accounts as of that date. All interested persons, including the incompetent and residuary legatees, were made parties, and following a report of the master appointed to examine said accounts showing the use of corpus, the account was approved.

In 1903 the trustee filed another account, covering the

period from his 1890 account, and asked for its settlement. At the time this account was filed the beneficiary of the $3000 fund was dead and the account showed that the trustee had continued to use corpus for his support and that said fund had been entirely exhausted. The residuary legatees were made parties and contended that the income alone was to be used for the support of the beneficiary and that the trustee should be surcharged the $3000.

The court, after expressing the opinion that the view taken by the trustee and approved by the court in 1890 was a reasonable one, said: "But, even if there were any doubt as to the meaning of the testator, we are of opinion that it would be inequitable, at this late day, to give the will a different construction. All of appellee's brothers and his sister were parties to the action brought by appellee in 1890 to settle his accounts as trustee. The imbecile son was likewise a party. While the papers were lost, it does appear that the court held that there was a certain balance in the trustee's hands, and that that balance be taken as the basis for future settlements. For appellee it is contended that the balance was $1,500, while appellants contend it was as much as $1,800. It is perfectly clear, then, that, whichever of these amounts is correct, appellee, at the time of that settlement, had used a portion of the trust fund, and the court in effect held that he was entitled to do so, for he directed that that settlement be made the basis of future settlements. Evidently the same contention was made in that action that is now being made. The court's judgment was in effect a holding contrary to that contention. Appellee's sister and brothers did not appeal from the judgment in that case. That being true, and appellee having settled upon the theory that he could use the corpus of the trust fund for the reasonable support and maintenance of J. T. Gossom, and having, since the settlement, acted upon the same

theory, it would not now be fair and just to him to require a settlement upon a different basis." (p. 1164.)

The case of *In re Leupp* involved the question of allocation of bond premiums between capital and income. Said the court: "In his intermediary accounts filed in 1917 and 1922, accountant specifically set up the identical allocation of bond premiums, which now constitutes the subject of complaint. The propriety or legality of said allocation was a matter entering into the court's determination to approve and allow said accounts, and hence, of necessity, the order of this court, dated October 8, 1917, approving the first of these accounts, determined this issue adversely to exceptant's present contentions, and thereby rendered it res adjudicata as against exceptant's cestui que trust; he having been one of the parties involved in said proceedings. In conformity with this judicial declaration, accountant continued to allocate said bond premiums in the manner thereby sanctioned and approved. It would thus seem that exceptant is now estopped and precluded from questioning the propriety or legality of said allocation, during the years following, as well as those preceding, the making of said order, in conformity with which all parties in interest acted." (p. 847.)

*In re Lafferty's Estate*, 230 Pa. 496, 79 Atl. 712, *supra,* involved the effect of a former decision in the same estate. This former decision turned on the question of whether or not the will of Francis Lafferty (a son of the testator) was a valid exercise of the power of appointment given to him in the will of his father. The same question was raised on the present accounting. Said the court: "In Lafferty's Estate, 209 Pa. 44, 57 Atl. 1112, this court affirmed the decree of the orphans' court, by which the share of the annuity to which, under the will of her grandfather, Rose E. Carr would have been entitled, if living, was awarded to her executor. That decision necessarily in-

volved the determination of the question whether or not the will of Francis Lafferty was a valid exercise of the power of appointment given to him in the will of his father. After the lapse of some six years, precisely the same question, in the same estates, under the same wills, is again presented by the decree from which the present appeal is taken.

"The decision in Lafferty's Estate, 209 Pa. 44, 57 Atl. 1112, became the law of the case, and stands as such. It must be accepted as a final adjudication of the question involved. In Bolton v. Hey, 168 Pa. 418, 421, 31 Atl. 1097, 1098, Chief Justice Sterrett referring to a former ruling in the same case, says: 'That judgment thus became the law of the case, and, having never been reversed or set aside, it is still the law of that case, notwithstanding a different rule of construction may have been since applied, with a different result, to contracts of like tenor and effect.' * * *

"The assignments of error are sustained, and the decree of the orphans' court is reversed, in so far as it awards income to the minor children of Rose E. Carr."

The foregoing authorities demonstrate that in view of the order or decree of the chancellor sustaining the exceptions to the recommendations of the master appointed to examine and report on the 35th annual account, it would now be unjust and inequitable to surcharge the trustees the expense incurred in employing bookkeepers and rent collectors, including premiums on their bonds. They have the right to rely upon that order or decree to protect them, so long as it stands unchallenged and they act in accordance with it. That is so even though, strictly speaking, the doctrine of *res judicata* may be of doubtful application.

For the future the whole question of the right of trustees of a charitable trust to employ bookkeepers and other necessary clerical assistance has been rendered moot by

Act 149 of the Session Laws of 1943, which amends section 3793 of the Revised Laws of Hawaii 1935 by providing that, in addition to their commissions, "Such trustees shall also be entitled to just and reasonable allowances for book-keeping, clerical, and special services and expenses incidental thereto."

A brief history of this estate and the character and extent of its assets will point the way to a correct decision on the question of the necessity of employing others to assist the trustees in the management of its affairs, other than those already discussed.

By her will, which was admitted to probate December 2, 1884, Mrs. Bishop devised life estates to various persons in particular portions of her vast real estate holdings, and devised to various other persons life annuities and specific sums of money, and by paragraph thirteenth she devised all of the rest, residue and remainder of her estate to five trustees upon the following trust, namely: "to erect and maintain in the Hawaiian Islands two schools, each for boarding and day scholars, one for boys and one for girls, to be known as, and called the Kamehameha Schools." By the same paragraph she directed her trustees as follows: "I direct my trustees to expend such amount as they may deem best, not to exceed however one-half of the fund which may come into their hands, in the purchase of suitable premises, the erection of school buildings and in furnishing the same with the necessary and appropriate fixtures, furniture and apparatus. I direct my trustees to invest the remainder of my estate in such manner as they may think best, and to expend the annual income in the maintenance of said schools; meaning thereby the salaries of teachers, the repairing of buildings and other incidental expenses; and to devote a portion of each year's income to the support and education of orphans and others in indigent circumstances, giving the preference to Hawaiians of pure or part aboriginal blood; the proportion

in which said annual income is to be divided among the various objects above mentioned to be determined solely by my said trustees, they to have full discretion." The reference in the foregoing to "the annual income" clearly refers to the net annual income, and the statement of what the income was to be expended for has no bearing on the right of the trustees to employ others in the management of the trust property.

The life tenants and annuitants have long since died and the whole of the vast area of lands has fallen into the general fund to be administered by the trustees. Both schools were established many years ago and are in operation. The master pointed out that the trustees have a dual function: they manage the endowment to produce income; they also manage the schools and spend the income for the support of the schools, duties specifically imposed by the will.

The trustees, by virtue of their office, are trustees of two other trusts, namely, the Charles R. Bishop Trust (the income of which is to be devoted to the same charity as the income of the Bernice P. Bishop Trust) and the Bishop Museum Trust (the income of which the trustees must expend in the maintenance of the Bishop Museum). From this it will be seen that the trustees must manage the endowment of the three trusts and must also manage and direct the spending of the income for the maintenance of the two institutions.

The assets of Bernice P. Bishop Trust consist largely of real estate comprising an area of more than 378,000 acres. The lands are classified and leased as follows: 57,662 acres of agricultural lands, leased to 34 sugar plantations and one pineapple plantation, and 7031 acres divided into 983 small farms, and leased to as many individual farmers; 254 acres of industrial and business lands, subdivided and covered by 291 leases; 232,757 acres of

grazing lands leased to 48 cattle ranches; 335 acres of residential lands subdivided into homesites, with 1024 tenants. Other lands are leased for miscellaneous purposes to 56 tenants. The gross rentals for the year ending June 30, 1938, were $1,011,769. Other income for the same period was approximately $36,000. The net rentals for that year were approximately $597,000. At the inception of the trust, in 1884, the gross revenues of the estate were approximately $50,000 per annum and the net approximately $35,000.

Most of the lands now owned by the estate are lands which the testatrix devised to her trustees, and the trustees (past and present) have so managed and developed the lands as to greatly increase the income derived from them. Some of the increased revenue can no doubt be attributed to the expiration of the life estates and to the general development of the Territory. But the development work carried on under the direction of the trustees has had no small part in increasing the revenues of the estate. The subdivision of the lands into small areas for leasing to home owners, small farmers, business men and corporations has greatly increased the revenues of the estate and at the same time multiplied the detail of work required to properly administer the trust. The most recent report of the trustees shows that more of the lands of the estate are being subdivided, surveyed and mapped preparatory to making them revenue-producing.

For the management of this vast estate the trustees have for many years maintained an office on Kaahumanu Street in Honolulu, divided into two departments, the general office and the land department, each responsible to the trustees. In the general office there are fourteen employees and in the land department there are fifteen; the employment of fourteen of the fifteen employees in the land department, which is at the expense of the estate,

was approved by the master and the attorney general does not question the correctness of his decision. It appears from the record and from an opinion of this court (*Damon v. Hyde*, 11 Haw. 153, 154) that as early as 1897 the trustees of this estate were employing a complete staff of assistants to do the regular delegable work of the trust. Without going into detail, it may be said that the evidence shows and the master found and stated in his report that because of the large amount of business done by the Bishop Estate it would be impossible for the trustees to transact that business without the assistance of a competent staff, such as they now employ and have employed for years past.

## PENSIONS AND ANNUITIES.

The record discloses that in 1919 the trustees began a study of retirement systems then in operation, particularly in educational institutions, the object being the adoption of a retirement system for their employees. Mr. Trent, one of the then trustees, was appointed a committee of one to assemble information on the subject. From time to time he reported to the board of trustees the information thus far obtained. The minutes of the proceedings of the board disclose that lengthy discussions of the subject were had each time a report was made. The minutes also disclose that on several occasions legal advice was obtained on the question and finally in 1921 a decision was made adopting the system which has since been followed to become effective September 1, 1922.

It was found that seven of the employees were too old to procure annuities. As they reached the limit of their usefulness they were to be retired on pensions, while those who were eligible were given the privilege of taking out an annuity policy with the Teachers Insurance and Annuity Association of America to the cost of which the estate would contribute not to exceed five per cent of the

individual's salary. This privilege was extended not only to the employees at the schools but also to those in the estate office. The system adopted was exclusive but was not compulsory. In other words, an eligible employee could decline to apply for an annuity policy, in which event he could not look forward to being pensioned regardless of how long he continued in the employment. The teachers were given written contracts of employment for one year at a time in which the annuity privilege was recited. Those who work in the estate office are not employed on written contract. They are, however, given the privilege of having the estate contribute to the cost of an annuity policy if they elect to apply for a policy.

On the foregoing facts we have no difficulty in determining that the trustees, in setting up the annuity system, acted within the broad power conferred upon them by the will to manage the estate and to maintain the schools for the support of which the trust was created. Their power to manage is very general and of course the terms upon which they will contract with an employee is left to their discretion, subject only to review by a court of equity for abuse. The obligation of the estate to contribute to the cost of an annuity policy became a term of the contract of employment. The trustees having the authority to thus contract with those employed, they not only acted within that authority but we think they should be commended for having taken this forward step at a time which places them among the pioneers in adopting a plan for old-age security of employees which has become almost universal. (53 Harv. L. Rev. 1375 [1939, 1940].)

The contract feature does not enter into the case of the superannuated employees who were pensioned. The copious minutes kept of the trustees' meetings disclose that the case of the small group of employees (all of whom were employed at the schools) who were unable to pro-

cure annuity policies because of their age was thoroughly discussed, and on April 1, 1921, it was decided that they should be pensioned when compelled to retire provided this was not prohibited by the terms of Mrs. Bishop's will. Accordingly, they called upon their attorney for an opinion as to their authority to take such action. They were advised that they had such authority by virtue of the general direction to manage the schools and to make all such rules and regulations as they may deem necessary for the government of the schools. Of the group of seven to be pensioned upon retirement four were teachers, one a nurse, one a janitor and one a night watchman. On May 5, 1921, the trustees unanimously adopted the recommendation of the president of the schools, of which the following are the pertinent terms: "(1) That no members of the staff be retired prior to June 1922; (2) That before January 1, 1922 a comprehensive plan of retirement on pension adapted to all classes of employees and involving some suitable scheme of joint contribution toward the expense involved by the Kamehameha Schools and the individuals who may elect to avail themselves of the opportunity, be formulated and adopted and presented to all members of the staff—such plan to become effective September 1, 1922; * * * ." The plan was formulated and adopted. The document containing the terms circulated by the trustees among their employees bears date March 24, 1922.

The first to be retired was one of the four teachers. He was retired in 1922, presumably on September 1 of that year. He was then seventy-three years of age and had been employed at the schools for thirty-three years; one was retired in 1923, aged sixty years, after thirty-one years of service; one was retired in 1929, aged sixty-eight years, after twenty-four years of service; and one was retired in 1931, aged sixty-nine years, after thirty-four years of serv-

ice. Two others of the group were retired in 1933: the nurse, on account of sickness, aged fifty-six years, after eighteen years of service, and the night watchman, aged sixty-seven years, after twenty-nine years of service. The janitor was retired in 1938, aged sixty-seven years, after twenty-one years of service.

The foregoing demonstrates that the trustees moved with caution and deliberation in adopting the annuity and pension systems. If they had been in doubt as to their authority after consulting their attorney, they could for their protection have sought the advice of the chancellor having jurisdiction of the trust on a bill for instructions. Unless they had such doubt, no basis for calling upon the chancellor for advice existed. (*Bishop* v. *Pittman*, 33 Haw. 647, 654.) Under the circumstances, we must determine whether the action taken transcended their authority.

"Trustees, in carrying the trust into execution, are not confined to the very letter of the provisions. They have authority to adopt measures and to do acts which, though not specified in the instrument, are implied in its general directions, and are reasonable and proper means for making them effectual. * * * Whenever the instrument of trust expressly confers upon trustees a discretion as to acts and measures in carrying out the general object of the trust, a court of equity will not generally interfere to control such discretion, except to prevent its abuse or unreasonable exercise to the actual or probable prejudice of the beneficiaries." 4 Pom. Eq. Jur. (5th ed.) § 1062a.

"Where the power is general to perform and carry out a particular object, a resort to the ordinary and usual methods or means comes within the scope of the power." *Faulk* v. *Dashiell*, 62 Tex. 642, 50 Am. Rep. 542.

"It is the ordinary doctrine that when an act is authorized to be done by a trustee or other agent, every authority

requisite to the doing of such act is, by intendment of law, comprised in such grant of power." *Hesketh* v. *Murphy*, 36 N. J. Eq. 304, 310.

Although a pension is, by some courts, referred to as a gratuity in which the pensioner has no vested right, on the theory that it may be discontinued, it is held by many of the same courts to be of kin to wages and salaries in that it is payable in stated installments for the maintenance of the servant after his productive years have ended and is basically a recompense for past services. (*Bowler* v. *Nagel*, 228 Mich. 434, 200 N. W. 258; *Passaic Nat. Bank & Trust Co.* v. *Eelman*, 116 N. J. L. 279, 183 Atl. 677.)

It is also held by many courts that public funds appropriated in conformity with legislative authority to pay pensions to retired employees or by a private corporation for the same purpose are not properly termed a gratuity but are expended for a public or corporate purpose, whether the object be to compensate the employee for services rendered or to stimulate others similarly engaged to continue in the service and properly discharge their duties. (See *State* v. *Love*, 89 Neb. 149, 131 N. W. 196; *Heinz* v. *National Bank of Commerce*, 237 Fed. 942, and authorities cited.)

All of those granted free pensions continued in the service after the adoption of the plan. That one was retired after only one year of service after the plan was adopted and another after two years, while others were compelled to serve much longer, is immaterial. (*State* v. *Love, supra.*)

It may be said that the authority of a trustee to grant pensions to superannuated employees is not analagous to the authority of a State or municipality to appropriate public funds for the payment of pensions to their employees who come within the terms of the legislative Act. However, in a jurisdiction which limits the expenditure

434

of public funds to a public purpose, the analogy is very close if not complete. Trustees directed to manage such an institution as the Kamehameha Schools, in the absence of a direction to the contrary in the trust instrument, are authorized to employ the necessary staff of teachers and others upon such terms as in the exercise of a sound discretion they find to be necessary, and their right to similarly provide for the retirement of the same employees when their years of usefulness have ended is quite analagous to the right of a legislature, operating under a constitution which limits appropriations to a public purpose, to appropriate public funds for a like purpose.

The principles applied to determine whether a contract or act of a corporation is *ultra vires* the corporation or its board of directors are also analagous to those applied to determine whether a contract or act of a trustee is within his powers. In the case of a corporation its powers are defined in its charter and are of two classes: (1) Those expressly granted, and (2) those impliedly granted, as reasonably incident and necessary to the carrying out of the powers expressly granted. (*Heinz* v. *National Bank of Commerce, supra.*) A trustee's powers are defined in the trust instrument and are likewise express and implied. (*Hesketh* v. *Murphy, Faulk* v. *Dashiell,* 4 Pom. Eq. Jur. [5th ed.] § 1062a, all *supra.*)

## RICE REHABILITATION AND ROAD REPAIR.

The trustees contributed $304 toward the expense of an experiment conducted by the Experiment Station of the University of Hawaii looking to the development of means to rehabilitate the rice industry in Hawaii. The Bishop Estate owns large areas of lands formerly leased to rice planters at good rentals. Modern methods in vogue elsewhere rendered rice culture in Hawaii unprofitable unless by the use of modern machinery the cost of

production could be lowered. The Federal Government and the Experiment Station of the University became interested and proposed that if the landowners would furnish the required machinery they would conduct the experiment. Accordingly, the trustees and other owners of rice land supplied the funds for the purchase of the required machinery and the experiment was conducted as agreed.

The master reported that this contribution constituted a gift and recommended that the trustees be surcharged the amount contributed. The exception of the trustees to this recommendation was sustained and the appellant has assigned the ruling as error.

The trustees also contributed $40.60 toward the repair of a private road on Bishop Estate lands at Waialae originally built by Waialae Ranch, a former Bishop Estate tenant. After the termination of the lease to the ranch the lands in the small valley served by the road were leased to various tenants in small parcels abutting upon the existing road. The road in question belongs to the estate and is the only means of access to the various leaseholds. The tenants were principally pig raisers and they used the road to haul in their feed and their pigs out to market. The road having gotten in bad shape the tenants asked the trustees to repair it. The trustees knowing that the Board of Health had objected to the raising of pigs in that area hesitated to expend estate funds for that purpose. Despite the objection of the Board of Health the tenants, with the help of their customers, went ahead with the repairs. Having exhausted their resources by expending more than $700 on the road the trustees, at the request of the tenants, purchased $40.60 worth of material with which the tenants completed the repairs by their own labor without charge.

The two foregoing expenditures were condemned by

the master as gifts of trust funds. The chancellor took a different view and sustained the exception of the trustees to the master's recommendation that they be surcharged the amounts expended.

It requires no citation of authority to sustain the proposition that these expenditures were for the benefit of the estate and were not gifts of estate funds.

### RENT OF LOCK BOXES.

The vault in the building belonging to the Bishop Estate and occupied by the trustees and their staff of employees for the conduct of estate business contains six lock boxes. Two of the boxes are used for the safekeeping of bonds and other securities belonging to the estate. Two are rented to the Charles R. Bishop Trust and one to the Bishop Museum Trust. The remaining box is termed an over-night box and is used by all three of the trusts when they have coupons to clip.

The master recommended that the trustees be charged rent for the use of the lock boxes used by them for the safekeeping of estate bonds and securities on the theory that they must, at their own expense, safely keep the bonds and other securities belonging to the estate. There is no suggestion of a surcharge as to this item, but to follow the master's suggestion would subject the trustees to a charge of the reasonable rental value of the boxes used by them.

Again the chancellor disagreed with the master and sustained the exception of the trustees to his recommendation.

In this we think the chancellor was right. The estate owns not only the lock boxes but also the vault in which they are situated, the building in which the vault is situated, and the land upon which the building stands. And yet there is no suggestion that the trustees should be

charged rent for the use of the land, building or vault of which the lock boxes are an integral part.

## SAFE DEPOSIT RENT.

The trustees, exercising the discretion reposed in them, decided to offer for sale $50,000 worth of Home Owners Loan Corporation Bonds and $100,000 worth of Federal Farm Mortgage Bonds to raise funds to pay for new school buildings being erected. There was no market in Honolulu for the selected bonds. The market was in the States. A broker in San Francisco was engaged to sell the bonds. He advised the trustees that it would facilitate the sale if the bonds were available for prompt delivery as sales were made. In order to facilitate their sale the trustees deposited the selected bonds with the Bank of California for safekeeping and delivery as sold. The trustees paid the bank $41.68 for this service and the master recommended that they be surcharged. The Home Owners Loan Corporation Bonds having been sold the trustees decided that the other bonds need not be sold and had them returned. The expenditure in question was essentially an expense of the sale of the bonds, as much so as a broker's fee, postage or express and insurance necessary to make delivery of the bonds when sold. We think it is immaterial that the trustees subsequently decided not to sell all of the bonds. The law does not require trustees to be infallible. If the fee of the bank was measured by the value of the bonds deposited, it is nevertheless true that circumstances which developed after the bonds were deposited with the bank caused the trustees to decide to withdraw them from sale.

We think it is clear that the action of the trustees conformed to the usual course of business and is not to be condemned.

## PALM RENTALS.

The master recommended that the trustees be sur-charged $19.50 expended by them for the rental of palms to decorate the office. The evidence is to the effect that Honolulu business houses very generally use palms and other plants to brighten the appearance of their places of business as a stimulus to their employees. The trustees learned from experience that it was cheaper to rent palms than to grow them. Since the estate must maintain a business office where its employees perform their duties, it is for the trustees to decide (subject only to review by a court of equity for abuse of discretion) what character of office is to be maintained. If they should decide to inordinately adorn their office instead of following the usual business practice of providing agreeable surround-ings for their employees the chancellor would doubtless refuse to approve the expenditure.

The decree sustaining the exceptions to the findings and recommendations of the master is affirmed.

*E. K. Kai*, Attorney General, and *J. V. Hodgson*, for-mer Attorney General (*W. Z. Fairbanks* with them on supplemental brief), for appellant.

*A. G. M. Robertson* (*Robertson, Castle & Anthony* on the briefs) for trustees of Bishop Estate and executors of A. F. Judd Estate, appellees.

*G. D. Crozier* for Theo. F. Trent and Cooke Trust Co., Ltd., co-executors under the will of R. H. Trent, deceased, appellees, filed a brief but did not argue.

### CONCURRING OPINION OF LE BARON, J.

With respect to the subject of estate charges of admin-istrative expenses for assistance in the delegable work of the trust created by the will of Bernice Pauahi Bishop, deceased, I concur with the opinion of the Chief Justice.

This court for the past thirty-five years has consistently upheld the fair and just principle, sustaining the common-law right of the trustee, that an estate should bear the reasonable administrative expenses for assistance when the employment thereof is reasonably necessary to its efficient administration. Under this principle an employment may not be warranted in one estate and yet be indispensable in another.

No disturbance whatsoever is made thereby of the general obligation imposed upon every trustee by the trust to fully perform all the trust duties necessary for the efficient administration of the trust estate. It is only when the efficient administration dictates that a reasonable necessity exists for outside assistance that an additional obligation arises to perform the duty of securing the required assistance for the benefit of the estate. The cost thereof is unquestionably administrative and therefore an estate expense. On the other hand, it is perfectly clear that the personal expenses of the trustee must be borne by the trustee and a personal expense includes the cost of employing an assistant when the employment is not reasonably necessary to the efficient administration of the estate.

In widely different kinds of estates of the Territory, this distinction is discernible and through which the principle of reasonable necessity operates justly. The principle is therefore durable, fundamental and applicable to all estates with equal effectiveness. It thus cuts through that which is unessential and is independent of that which is extrinsic, mattering not whether the nature of the assistance required for the efficient administration of the trust be deemed ordinary or extraordinary, routine or unusual, regular or special, simple or complicated, within or beyond the skill and experience of the ordinary trustee. It further makes a salutary and sound rule, prevailing in

other jurisdictions and recognized by eminent authorities in the law of trusts.

Applying this basic principle in passing upon the trustees' fifty-third annual, fifty-fourth annual and special accounts now before this court, the record shows that the expenses for assistance are all unquestionably reasonable and the employment reasonably necessary to the efficient administration of the estate. This is not disputed by the master nor by the appellant. Hence the expenses are administrative and therefore proper estate charges, aside from any additional assurance which may be drawn from the doctrine of *res judicata*.

It may be of interest in considering the inception of this litigation and the proportions to which it has grown that the record, the master's reports and appellant's briefs and arguments show that the opinion of the court in the *Estate of Mary E. Foster*, 34 Haw. 417, inspired the presiding chancellor on June 27, 1939, to vacate his order which a month earlier had approved not only such expenses as charges to the estate but the entire fifty-third annual account, acted as a guide to the master in subsequently recommending the surcharge of such expenses and the disapproval of all three sets of accounts before the court, and strengthened the appellant's support of the master's recommendations in opposing the application by the court of this essential principle, both below and on appeal. However, the court in the *Mary E. Foster* case pointed out that it is entirely the court which passes upon the necessity and amount of an estate's administrative expenses and that section 3793, Revised Laws of Hawaii 1935, has nothing to do with the charging of an estate therewith. In carrying into effect this observation, the authoritative holding upon analysis of the *Mary E. Foster* case is that, there being no necessity in the efficient administration of the Foster estate for the employment of a

bookkeeper by the month to keep its books and to render its annual accounts, the expense for his service was personal rather than administrative and therefore not chargeable to the estate. As an adjudication it is complementary of the principle of reasonable necessity, the court never intending that its language should have the broad and general application as urged by the appellant.

Realizing the utter sincerity and good faith of the chancellor, master and appellant, it should be noted, in fairness to them, that the court did not expressly enunciate this intrinsic principle in the *Mary E. Foster* case. However, every adjudication must rest upon the facts peculiar to it and the issues before the court. This is especially true where this court has disallowed charges against smaller estates, differing greatly in their character and size from other estates, and in the type, volume and degree of work required. Language in such cases sometimes may appear to state general rules, which apparently might be applicable to larger estates, but in reality reflect merely the specific problem at hand, as well as being extrinsic to the reason for the adjudication. A danger therefore is present in placing too great a reliance upon isolated parts thereof to prove a thesis for general application in other cases.

An example of this danger appears in the appellant's position in respect to the present accounts involving one of the largest estates in the Territory, through his reliance upon a statement made in the *Estate of A. Enos*, 18 Haw. 542, cited in the *Mary E. Foster* case and involving one of the smallest estates in the Territory. The statement is that "the ordinary clerical work must be performed, or paid for, by the administrator himself." Standing alone, it might appear to be a general rule. But the statement does not stand alone, nor is it necessary to the adjudication. It is a part of a sentence which reads in full:

"Recognizing that under certain circumstances clerical assistance for an administrator may be necessary and should be paid for by the estate, still the ordinary clerical work must be performed, or paid for, by the administrator himself." The court thereafter expressly disclosed the controlling, indispensable and pivotal reason and ground for its adjudication and applied the proper test by adding: "In this case there was no reasonable necessity for employing outside clerical help, and consequently the amount paid therefor is disallowed." This final statement is basically illustrative of the application of the principle of estate charges and leaves no room for doubt that the bare statement regarding the ordinary clerical work was clearly unessential to that case and subordinate to the fact that assistance was not needed. It and other statements like it are therefore limited in meaning and were intended to apply only to a case where there was no reasonable necessity for employing outside clerical help and not generally to cases where assistance is reasonably necessary. The converse of such bare statements, removed from their position in the opinion, would be that extraordinary clerical work is chargeable to an estate. However, it is obvious that all such work certainly would not be so chargeable, but would be only in cases where the employment is reasonably necessary. The converse statement therefore is subordinate and limited to an opposing factual situation.

The same danger may be found in the appellant's reliance upon comparable statements in the *Mary E. Foster* case, involving one of the Territory's relatively smaller estates and without any precautionary expressions by the court indicating the pivotal turning point of its adjudication. The appellant's thesis in the instant proceedings rests primarily upon two of the statements in that case, dealing with clerical assistance similar in nature to that dealt with in the *Enos* case. They are in effect that a clerical service within the skill and experience of an or-

dinary trustee is not chargeable as an expense to the estate and the converse that one beyond such skill and experience is chargeable. The former is but another way of expressing the bare ordinary-clerical-work statement. It likewise appears in an adjudication which turns upon facts showing that there was no reasonable necessity in the efficient administration of the estate to employ outside clerical help. It therefore is subordinate and limited to the same factual situation as is its counterpart in the *Enos* case. The converse statement of beyond-such-skill-and-experience substantially paraphrases the extraordinary-clerical-work statement. It, too, is subordinate and limited to the opposite situation where the employment is reasonably necessary.

Consequently, it is evident that the integrity of all these statements, dealing with the nature of clerical assistance in the determination of an estate charge, is contingent upon one factual situation or the other, the determining factors being the lack of any need for assistance or the presence of a reasonable necessity for the employment. Whatever utility they may have, such statements are not tests but in effect are mere guides to their related facts which in turn are determinative of the requirements of efficiency in the administration of estates, the court consistently disallowing charges when assistance is not needed and allowing them when the employment is reasonably necessary. Thus do the statements subserve the fundamental principle of reasonable necessity within the adjudications in which they appear.

There are other examples of this danger in the court's language in the *Mary E. Foster* case, including the so-called *quantum* rule, where the appellant's reliance led him directly athwart of this underlying principle, but the court in disallowing the charge was dealing strictly with an unwarranted assistance upon which its language was predicated. There being no need in the administration of the

Foster estate for the additional service of a bookkeeper by the month, it follows that the employment of one by the trustee would be purely a personal expense. Consequently, the court was not in error in pointing out that in such a state of affairs the length of the books of account or accounts was immaterial and that the trustee should have serviced them himself, which was reasonably expected of him as one of the duties of the trust within the skill and experience of an ordinary trustee, and that therefore, if for any reason he were unable to perform the work of an ordinary trustee or desired to be relieved of the burden thereof, he either personally should have paid the bookkeeper to do it for him out of his trustee's fee or have declined the trust. However, it should never be lost sight of in considering any of the statements in the *Mary E. Foster* case that the court had before it a personal expense in a comparatively small estate whose efficient administration did not require the assistance of a regular bookkeeper. Hence its statements are dependent upon and dominated by that one factual situation, logically preventing the formulation of rules, which, if made to apply strictly to the administration of an estate in another case under an opposing factual situation, would cause the statements to react contrarily to the authoritative holding of the very case from which they were taken.

Brushing aside all matters extrinsic to what is clearly the essential principle of estate charges, the main problem in passing upon these accounts is solved simply by its application. The task here of determining whether the cost of assistance is administrative is made immeasurably easier because the expenses are admittedly reasonable and the employment concededly a reasonable necessity, the record showing it to be imperative for the efficient administration of the estate.

With the remainder of the Chief Justice's opinion in denying the entire appeal, I am also in complete accord.

OPINION OF PETERS, J., CONCURRING IN PART AND
DISSENTING IN PART.

I respectfully dissent from so much of the opinion of the majority as affirms the action of the trial judge in sustaining the exceptions of the trustees to the findings and recommendations of the master in respect to expenses incurred for bookkeeping, clerk hire, collection commissions and bond premiums. Nor do I subscribe to any notion that the decree of November 15, 1920, constitutes *res adjudicata* and forecloses the attorney general from challenging those items in this case.

Due to the action of the 1943 legislature in amending the law (R. L. H. 1935, § 3793) in respect to the compensation of trustees and the reimbursement of expenses of administration where the trust created is for charitable purposes,[1] I hesitate to express my opinion upon the subjects of disagreement. But I am not satisfied that the

---

1 "Section 1. Section 3793 of the Revised Laws of Hawaii 1935, as amended, is hereby further amended by inserting therein, following the first full paragraph thereof appearing on page 621 of said Revised Laws, the following paragraph:

" 'Notwithstanding any other provisions of this section or of any other law, in the case of an estate of a charitable trust, the commissions of the trustees shall be limited to the following schedule of percentages on all moneys received in the nature of revenue or income of the estate, such as rents, interests,.and general profits:

| | |
|---|---|
| 10% on the first | $ 1,000.00 |
| 7% on the next | 4,000.00 |
| 5% on the next | 100,000.00 |
| 3% on the next | 100,000.00 |
| 2% on the next | 300,000.00 |
| 1% on all over | 505,000.00; |

but said schedule of percentages shall be applied not oftener than once a year.

" 'Such trustees shall also be entitled to just and reasonable allowances for bookkeeping, clerical, and special services and expenses incidental thereto.'

"Section 2. This Act shall apply as well to future accounting in existing estates as to new estates.

"Section 3. This Act shall take effect upon its approval." Sess. Laws 1943, Act 149.

statute as now amended relieves trustees of charitable trusts of the duty of personally keeping books of account or of personally performing other clerical services. These matters, in my opinion, are still open and my views upon the subjects of expenses of bookkeeping and clerk hire as applied to the instant case may be of some assistance in the event that the same or similar questions arise under the amendment or the legislature at some future session may see fit to further amend the law so far as it affects the compensation of or allowances to trustees for their care and management of public charitable trusts.

Otherwise I concur in the conclusions of the Chief Justice.

Bookkeeping: The place of business of the trustees is on Kaahumanu Street, Honolulu. At its place of business it maintains a land department and a general office for the transaction of business. The Kamehameha School for Boys and the Kamehameha School for Girls established and maintained pursuant to the provisions of the will of the testatrix are at Kamehameha Heights, Honolulu. The comptroller of the schools has an office on the grounds of the Kamehameha School for Boys where are kept subsidiary books of account reflecting the internal financial administration of the schools. The books of account of the schools reflecting the cost of their establishment and maintenance are kept at the general office. None of the bookkeeping expenses in controversy involves the expense of keeping books of account in the land department or the books of account of the Kamehameha Schools, whether kept at the schools or at the general office of the trustees. The only bookkeeping expenses in controversy are those incurred in the conduct of the business of the trust in the general office of the trustees on Kaahumanu Street.

The expenses of bookkeeping, the surcharging of the

trustees with which was recommended by the master, included in whole or in part the salaries of six employees of the general office of the trustees, *viz.*, the office manager, the chief accountant, two bookkeepers, the cashier and office boy when acting as assistant cashier.

The trustees presented to the master a memorandum of the personnel and duties of all employees, including those employed in the keeping of the books of account of the business of the trustees at the general office. This memorandum may be accepted as a fair presentation of the clerical setup obtaining in the general office. The evidence adduced contains explanations of the system of bookkeeping employed. The trustees contend, first, that the books of account were not within the skill and experience of the ordinary trustee, and second, that even if they were within the skill and experience of the ordinary trustee, the expenses of bookkeeping are chargeable against the trust estate for the reasons that (a) from the terms and provisions of the will of the testatrix and other extrinsic facts, it appears that it was not her intention to impose upon the trustees personally the duty to perform clerical services, including that of keeping the books of account of the trust; (b) in the absence of express statutory provisions to the contrary, the trustees are by implication entitled to be reimbursed for all necessary and reasonable expenses incurred in the administration of the trust; (c) the trustees are entitled to an allowance for all such clerical assistance as may be necessary to employees in performing their duties and effecting the purposes of the trust in accordance with the nature and condition of the trust property; and (d) the trustees upon principles of equity are entitled to reimbursement for expenses necessarily incurred in the management of the trust property.

During the periods involved in the accounts under review the law applicable to compensation of trustees was

448

Revised Laws of Hawaii 1935, section 3793, as amended by Session Laws 1935, Act 124, Series C-95.[2] The trustees in each of said accounts credited themselves with the statutory commissions.

The construction of the statute in respect to the allowance of the salary of a "bookkeeper" was before this court in *Estate of Mary E. Foster*, 34 Haw. 417.

In my opinion the issues of law involved in this case with respect to expenses incurred by the trustees for bookkeeping are controlled by the opinion of the court in the *Foster* case, and the contentions of the trustees urged under 2 (a), (b), (c) and (d) more properly apply to the surcharges in respect to "clerk hire." The trustees have

---

2 The original statute of Hawaii allowing compensation to fiduciaries is the Act of June 2, 1848, entitled "An Act to Regulate the Costs in the Judiciary Department." (Laws 1848, pp. 4, 9.) It is there provided:

*"Fees of Executors, Administrators and Guardians.*—For receiving and paying out all sums of money not exceeding one thousand dollars, ten cents for every dollar.

"For receiving and paying out all sums of money exceeding one thousand dollars and not amounting to five thousand dollars, seven cents for every dollar.

"For receiving and paying out all sums exceeding five thousand dollars, five cents for every dollar;

"And in all cases, such *allowance shall be made for their actual expenses, as to the judge shall appear just and reasonable.*

"Where any provision shall be made by any will for a specific compensation to an executor, the same shall be deemed a full satisfaction for his services in lieu of his allowance as aforesaid, or his share thereof; unless such executor shall by a written instrument, to be filed with the Judge of Probate, renounce all claim to such specific compensation." (Emphasis supplied.)

These provisions of the original Act were incorporated in section 1281 of the Civil Code of 1859 in the following language:

*"Fees of Executors, Administrators and Guardians:*—For receiving and paying out moneys, ten cents for every dollar up to and not exceeding one thousand dollars; seven cents for every dollar over one thousand, up to and not exceeding five thousand dollars; five cents for every dollar over five thousand dollars; and *such additional allowance for their actual expenses as the judge or court shall deem just and reasonable.* [Remainder the same.]" (Emphasis supplied.)

expressed themselves as being in complete accord with the opinion of this court in the *Foster* case, disagreeing only with the statement there made "That the books of account

Section 1281 of the Civil Code of 1859 was incorporated in the Compiled Laws of 1884 under the same section number. On January 11, 1893, section 1281 of the Civil Code relating to the fees of executors, administrators and guardians was amended by chapter 98 of the Session Laws of that year. (Laws 1893, c. 98, p. 280.) By the amendment of 1893, instead of the commissions of fiduciaries named being computed upon "moneys received and paid out," commissions were computed upon "all moneys received and accounted for" by them and moneys received and accounted for were segregated into "all moneys received representing the estate at time of the institution of the trust, such as cash in hand and moneys realized from securities, investments, and from sales of real estate and personal property other than interest, rents, dividends and other profits coming due after the inception of the trust," upon which a commission of two and one-half per cent was allowed, and "all moneys received in the nature of revenue or income of the estate, such as rents, interest and general profits," upon which the commissions of ten, seven and five per cent were allowed similarly as in the former statute. An additional commission of two and one-half per cent was allowed upon final payment of the former. The effect of the amendment was to increase the compensation of fiduciaries. By the same amendment the previously existing provision for "such additional allowance for their actual expenses as the judge or court shall deem just and reasonable" was omitted.

Section 1281 of the Civil Code as thus amended was carried into the Laws of 1897 as section 1493, into the Revised Laws of 1905 as section 1890, into the Revised Laws of 1915 as section 2542, and as amended by Session Laws 1931, Act 216 (immaterial to our consideration), into the Revised Laws of 1925 as section 2544.

In 1927 the Revised Laws of Hawaii 1925, section 2544, was further amended in respect to the compensation paid to fiduciaries to read as follows:

"Fees and expenses of executors, administrators, trustees and guardians: Upon all moneys received in the nature of revenue or income of the estate, such as rents, interest and general profits, executors, administrators, trustees and guardians shall be allowed as commissions payable out of the income, ten per cent for the first thousand dollars, seven per cent for the next four thousand dollars, and five per cent for all over five thousand dollars, such commissions to be allowed upon each accounting when made but not oftener than once a year.

"* * *

"Upon the principal of the estate, trustees and guardians shall be

or the accounts as filed are lengthy is immaterial. The graduated compensation allowable to trustees under the statute takes care of the increased labor"; asserting that this is mere dicta and to the extent that it conflicts with their contentions as set forth in 2 (a) to (d), both inclusive, is erroneous.

For the present we shall consider the questions involved in the light of the tests enunciated in the *Foster* case. "The solution of this question necessarily depends upon the character of the system reasonably necessary to keep the accounts involved in the instant trust estate and to render annual accounts to the court of the trustees' appointment for under the law accordingly as they were beyond or within the skill and experience that might be

---

allowed as commissions, one per cent on the value at the inception of the trust payable at such inception out of the principal, one per cent on the value of all or any part of the estate upon final distribution thereof payable at such termination out of the principal, and two and one-half per cent upon all cash principal received after the inception of the trust and neither being nor representing principal upon which said two and one-half per cent has previously at any time been charged, payable at such receipt out of the principal, and two and one-half per cent upon the final payment of any cash principal prior to the termination of the trust, payable at said final payment out of the principal. For the purposes of this paragraph, the value of the estate shall be determined in such manner as the court may approve.

"Such further allowances may be made as the court shall deem just and reasonable for special services. All contracts between an executor, administrator, trustee or guardian and an heir, devisee, legatee, ward, or a beneficiary other than the creator of the trust, for higher compensation than is allowed in this section shall be void.

"These provisions shall apply as well to future accounting in existing estates as to new estates."

It should be noted that by the amendment of 1927 trustees were included *eo nomine* in the enumeration of the fiduciaries to which the statute applied and provision was made for the first time for additional compensation as and for "special services."

This, except for the amendment of 1935 (Sess. Laws 1935, Act 124) which is also immaterial to our consideration, was the condition of the law in respect to the compensation of trustees during the respective accounting periods.

reasonably expected of the ordinary trustee, the trustees are or are not entitled to reimbursement."

The evidence overwhelmingly sustains a finding that the system of bookkeeping reasonably necessary under the provisions of the will of the testatrix and the provisions of law prescribing the legal duties of trustees is a simple double-entry set of books containing a simple segregation of corpus and income, the former to contain the further segregation of "cash principal" as that term is used in Revised Laws of Hawaii 1935, section 3793, as amended, and "final payment" as that term is employed in said section and as construed by this court in the case of *Smith* v. *Lymer*, 29 Haw. 169.

What system of bookkeeping is reasonably necessary to the observance by the trustees of their legal duties to keep full and accurate accounts is not a mere matter of discretion, with the exercise of which by the trustees, equity will not interfere. On the contrary, where trustees claim the right to reimbursement of the salaries paid accountants upon the ground that the services performed by them are beyond the skill and experience ordinarily possessed by trustees, the burden rests upon the trustees to show that the necessary premise exists for the assertion of the right to reimbursement, to wit, a trust estate, the keeping of the accounts of which reasonably and necessarily include the bookkeeping complications and difficulties for the handling of which the accountants were employed. To make discretion of the trustees the sole test of the necessity of the system of bookkeeping required would substitute the discretion of trustees for that which was reasonably necessary under the facts.

I say a double-entry set of books for the reason that it is undisputed that a double-entry set of books is a system of bookkeeping uniformly employed in the Territory in business concerns of any size. And I say a simple segre-

gation of corpus and income because the provisions of the statute in respect to the computation of the compensation of trustees admit of a simple segregation, one that the trustees themselves could intelligently apply and the court to which the accounts are presented could easily understand.

By the thirteenth paragraph of her will, hereinafter quoted, the testatrix, after devising and bequeathing unto her trustees all the rest, residue and remainder of her estate upon trusts, among others, to erect and maintain the schools to be known as the Kamehameha Schools, directed that her trustees should annually make a full and complete report of all receipts and expenditures to the chief justice of the supreme court or other higher judicial officer in the country, and also to be filed before him annually an inventory of the property in their hands and how invested. Under existing law the circuit judge, at chambers, is the court to which such annual report must be made. This provision of the will of the testatrix is complete and comprehensive and no doubt includes all the statutory duties in respect to annual accounting required by the Revised Laws of Hawaii 1935, section 4713, as amended. If these requirements exceed the requirements of the statute it is immaterial. They must be obeyed. Moreover, the will of the testatrix created a perpetual public charity, the beneficiaries of which, through the appropriate officer of the Territory, are entitled at all times to the information which regular and accurate accounts afford.

The assets of the Bishop Estate are mainly lands vested in the trustees in fee simple. In the aggregate they exceed eighty-five per cent of the value of all the assets of the trust. The principal business of the Bishop Estate is the rental of lands, the fee of which is in the trustees. Its average annual income derived from that source exceeds ninety-two per cent. Rentals, except where value of the

use is computed upon produce, are based upon the value of the fee, plus territorial real property taxes. Its remaining assets are bonds, mortgages, notes, stocks and certificates of deposit. The character of its assets and income admits of simple books of account.

The system of bookkeeping employed in the general office of the Bishop Estate embraces the principles of the system usually referred to as a double-entry system. This system of bookkeeping is too well and generally known to require comment.

The only books included in the set of books kept in the general office of the Bishop Estate other or in addition to those ordinarily included in a double-entry set of books are tenants' cards, reflecting tenants' debits and credits on account of rents and real property taxes, and a tenants' journal. The tenants' cards and tenants' journal are merely convenient substitutes for the usual and customary general ledger and journal.

The only accountancy imposed upon the trustees other than, or in addition to, that usually involved in the keeping of a double-entry set of books is the duplication, for the purposes of its annual report to the court, of receipts and vouchers of book entries of cash receipts and disbursements, the preparation in inventory form of its assets, and conformation to the segregations effected by the auditor in 1931 of capital assets into corpus and income accounts and the segregation of both accounts into respective subsidiary accounts.

What skill and experience in bookkeeping might be expected of the ordinary trustee was not decided in the *Foster* case, *supra*. The question of the bookkeeping qualifications of the hypothetical trustee was left open. But the test remains.

To determine what skill and experience in bookkeeping may be expected from the ordinary trustee, it is legiti-

mate to consider the types and sizes of estates reasonably admitting of the creation of trusts, the ordinary legal duties of trustees, the educational facilities provided by the public schools of the Territory, including instruction in bookkeeping, and the education and business experience of the average member of the class from which trustees are selected.

A private trust necessarily implies the conservation of the assets of the trustor for a determined period within the limitations imposed by law and its use during that period for the benefit of the *cestuis.* Experience and observation tell us that the assets of an estate to admit of its creation into a trust should be substantial. In the absence of an estate of substantial size, the purposes of the trust may prove abortive. This is peculiarly so in the case of charitable trusts. The usual routine in the case of charitable trusts is to preserve and conserve the endowment and to devote income only to the purposes of the charity.

The duties imposed by law upon trustees are important considerations in determining the general qualifications of the class from which they are selected, and the qualifications of a trustee are tested by reference not to the degree of care and prudence which he uses in the management of his own private affairs but by the average standards of the ordinary trustee.[3] A person is not qualified to act as a trustee who does not possess the skill in and knowledge of the art of bookkeeping possessed by the ordinary trustee.

But how much skill in and knowledge of the art of bookkeeping is possessed by the ordinary trustee? Although the trustees contend that the books of account of the trust are not simple but on the contrary are complicated and beyond the skill and experience of the ordinary trustee, no effort was made by them to establish any

---

[3] *Knox* v. *Mackinnon,* 13 L. R. App. Cas. 753, 766, 767 (1888).

standard. And the burden rested upon them to establish that standard. It was not sufficient for them to show if they could that the books of account of the estate were complicated but also that they were beyond the skill and experience possessed by the ordinary trustee. And in the absence of such additional proof their contention in that regard has no basis for its support.

It might be said that the qualifications of the ordinary trustee are a matter of common knowledge and the establishment of a standard is within the exclusive province of the trier of the facts similarly as the qualifications of the hypothetically careful and prudent man. If this be so, from a careful analysis of the system of bookkeeping employed, I am convinced that the books of account of the trust did not require skill and experience beyond what might be expected of the ordinary trustee.

It is a matter of common knowledge that the education of the average youth of the Territory of Hawaii includes a high school education and that instruction in elementary bookkeeping is included in the curricula of all high schools in the Territory. It is also a matter of common knowledge that the members of the class from which trustees are selected are usually men who have had considerable business experience succeeding the completion of their school education. Experience and observation teach us that most trustees are connected with big business either directly or indirectly and have a working knowledge of double entry bookkeeping. It, therefore, may be said that the average member of the class from which trustees are selected in the Territory of Hawaii has had at least a high school education or its equivalent, including instruction in elementary bookkeeping, followed by considerable business experience including experience in keeping or supervising the keeping of a double-entry set of books, and from education or experience, or both, is qualified to keep a simple double-entry set of books.

The system of bookkeeping employed in the general office of the Bishop Estate is simple. Due to the source of the greater portion of its income and the character of its assets there is no great variety of transactions. The number of subsidiary accounts presents no problem. If subsidiary accounts are multiplied, the system of bookkeeping of which they are a part is not changed. "Subsidiary accounts may be doubled or some omitted and the system would remain the same. It is merely a difference of degree." The volume of entries is not sufficient to complicate matters. No complexities are involved with the possible exception of conformation to the segregation of corpus and income accounts initiated by the auditor in 1931 and of the afterclosing journal entries made consistently therewith preparatory to striking a final trial balance at the close of the fiscal year. It is well within the definition and concept of the term "double entry system."

The complexities allegedly involved in the journal entries pertaining to the segregation accounts are more fanciful than real. They are nothing more than a repetition of the same entries made each year pursuant to the instruction of the auditor in 1931. These accounts were set up by him and the necessary journal entries made by him as of June 30, 1930, and the same segregation has been persisted in ever since. As suggested by the auditor in his report that they might be, these segregations were "used as a guide for final adjustment purposes in subsequent years" including June 30, 1938 and June 30, 1939. He advised, "With the appropriation accounts showing the divisions and subdivisions of the Estate capital set up and in working order, annual adjustments to give effect, in summary form in these appropriation accounts, to the changes in the asset groups during the year, will cover all the requirements." His lead was simply followed. As observed by this same auditor, as a witness called on be-

half of the trustees, bookkeeping is principally a matter of repetition. Moreover, a segregation of corpus into corpus realized and unrealized, and the further segregation of those accounts into corpus appropriated for Kamehameha School grounds or for Kamehameha School fixed assets becomes important only as it might assist in the computation of trustees' commissions. One of the reasons assigned for the inauguration of the accounts segregating capital assets was to segregate surplus income and unappropriated income, the former account being again subdivided into appropriations for Kamehameha School fixed assets and appropriations for other fixed assets. Appropriations of income have nothing to do with the computation of trustees' commissions and if devised for that purpose upon the authority of *Bishop* v. *Kemp,* 35 Haw. 1, were misconceived. It is doubtful whether any useful purpose is served by the ability to ascertain from the books whether appropriated surplus income had been appropriated for desks at Kamehameha Schools or for an automobile, except as appropriations might constitute final payments.

The contention that these segregation accounts rendered the books of account of the trust complicated and beyond the skill and experience of the ordinary trustee presents an amusing *non sequitur.* The trustees of the Bishop Estate, as far as the record discloses, possess no greater bookkeeping skill and experience than that possessed by the ordinary trustee and yet the segregation accounts were installed pursuant to their instruction for the primary purpose of the computation of their commissions. It affirmatively appears from the report of the auditor who installed the segregation accounts that these accounts were not installed by him to meet the exigencies reasonably and necessarily arising from keeping accurate books of account of the trust but in compliance with the

458

instructions of the trustees themselves. If the system of segregation is as contended and the making of journal entries in conformity thereto not within the skill and experience of the ordinary trustee, it is a matter of conjecture why the present system of segregation should have been installed at all, its main purpose being to assist the trustees in computing their commissions; and the trustees themselves protest that the system is not within the skill and experience of the ordinary trustee.

There is no evidence in the record showing or tending to show that in order to comply with the bookkeeping task imposed upon them it was reasonably necessary for the trustees to segregate capital assets and surplus income to the extent required by the elaborate system set up. Further than segregating corpus so that statutory commissions on corpus and final payments might be computed, the system does not seem to serve any useful purpose. It also appears that the same information is otherwise readily available.

Moreover, even if it were conceded that the journal entries in respect to the segregation accounts presented complications beyond the skill and experience of the ordinary trustee, the presence of this element of complication would not render all the books complicated and beyond the skill and experience of the ordinary trustee. The expense that might be involved in having the journal entries made by others is readily separable from the total bookkeeping expense. Even if upon occasion complications or difficulties in the keeping of accounts may arise and the employment of expert assistance becomes necessary, I see no reason for the continued employment of expert bookkeepers competent to meet such contingencies. The books of account of the trustees are audited quarterly by independent auditors at the cost of the estate. These auditors are certified public accountants. A part of their duties

as auditors is to make such corrections in the books and such recommendations as to future conduct as the exigencies in the keeping of the accounts suggest. Before it may be said that expert accountants can be employed continuously by trustees, it must appear that the necessity is continuous. The test is what an ordinarily careful and prudent trustee would do under similar circumstances. It does not appear that those instances upon which, as claimed by the trustees, the bookkeeping task involved exceeded the skill and experience possessed by the ordinary trustee, were sufficiently frequent to justify the employment of expert accountants continuously.

Another instance in the keeping of the books of the trust which the trustees contend is beyond the skill and experience of the ordinary trustee, is the operation of the mechanical bookkeeping machine used in the general office of the trustees. It appears that this machine operates similarly as a typewriter, except that differently from a typewriter the frame and not the carriage moves over the typed page and in consequence more physical exertion is required than is ordinarily necessary in the operation of the typewriter. This machine also includes a mechanical calculator admitting of the entry of balances. Similarly as with a typewriter, duplication is effected in one operation and duplicate entries are made where the same entry may be appropriately entered in the same form in more than one book of account. The absurdity of the contention is obvious. The legal test is whether the system of bookkeeping necessary to keep the accounts of the trust is within or beyond the skill and experience that may be expected of the ordinary trustee and not whether the trustees possess sufficient skill and experience to operate a mechanical labor-saving device used in keeping such books. The entries which the device records are but the simple entries necessary to record the receipt and expenditure of

moneys and but a repetition of the same information contained in receipts and vouchers and possess no inherent difficulties or complications. It is the skill and experience required in operating the machine and not the skill and experience involved in the making of the entries against which the trustees protest. If the system of bookkeeping necessary is within the skill and experience that may be reasonably expected of them, then it is the duty of the trustees, within the decision of the *Foster* case, *supra,* to personally keep the books of account themselves, and they cannot avoid that duty by the simple expedient of substituting for their own labors a mechanical labor-saving device which they claim is not within their skill and experience to operate.

The trustees complain that under the provisions of the trust created in the instant case there are other and additional duties required of the trustees not present in the ordinary private trust justifying employment of others to perform delegable duties. Duality of duties may be said to exist. Ordinarily, the trustee of a private trust is concerned merely with the administration of the trust *res.* The ultimate disposition of the corpus or income devolves upon others. In the instant trust, in addition to the administration of the trust *res*, the trustees are required to maintain schools. All the actual work of conducting the schools is performed by others at the cost of the estate, but the responsibility therefor rests with the trustees. The duties imposed upon the trustees in respect to the maintenance of the schools, however, are those imposed by the will of the testatrix. The duality of duties imposed by the will upon the trustees does not entitle the trustees to additional compensation.[4] The testatrix made no pro-

---

[4] *In re Taft's Estate,* 8 N. Y. Supp. 282; *In re Larrabee,* 98 N. J. Eq. 655, 130 Atl. 194, 197, 198; *In re Froelich's Estate,* 107 N. Y. Supp. 173, 179.

vision for the compensation of her trustees. Consequently they are relegated for their compensation to the provisions of the statute. And the provisions of the statute control. Unless the statute admits of additional compensation for the additional duties imposed, or provides for allowance to the trustees by way of reimbursement of the expense of the performance by others of services which the trustees are required by law to perform themselves, the only agency that may afford relief is the legislature. The courts are powerless in the premises.

Nor does the number of entries in the books of account *per se* affect the question. No complications appear as a result of the volume of entries. Whether a given set of books are within or beyond the skill and experience of an ordinary trustee is not measured by the number of entries. It is the character of the system employed that controls. It was so held in the *Foster* case, *supra*, and the language of the court to which the trustees take exception was not dicta but in response to the contentions advanced by the trustees in that case. The trustees in the *Foster* case contended, similarly as the trustees here, that the number of entries necessary in keeping the accounts of a trust of the magnitude of the *Foster* trust should be considered in determining whether the keeping of the accounts was a duty which they should perform themselves or for which they could, at the expense of the estate, employ a bookkeeper. Moreover, the action of the court in amending its opinion in the *Foster* case in respect to remand does not detract in the slightest particular from the statement of the court. In their motion in that case to amend the opinion, the trustees declared: "That they acquiesce in the ruling of this Honorable Court to the effect that the services of a bookkeeper in keeping the books and preparing the annual account for the year 1935 constitutes duties to be performed by them, and that they are not entitled

to reimbursement for the sums paid to a bookkeeper for the performance of such work. That in the annual account under review the items appearing under the designation 'bookkeeper's salary,' * * * are payments not only for the actual keeping of the books and the preparation of the annual account but also for the performance of many duties necessary to the proper administration of the trust, which services, your Trustees are advised by counsel, are, notwithstanding the ruling of this Honorable Court relating to the salary of a 'bookkeeper,' proper items of expenditure by the Trustees for which they may properly be reimbursed out of the trust estate consistently with the opinion of this Honorable Court." If this were true and the salary of the bookkeeper included services rendered other and in addition to that of bookkeeping, to the reimbursement of which said trustees were legally entitled, obviously the trustees were entitled to make that showing upon remand. Hence, whereas the court in its original opinion had disposed of the case by ordering that "Reimbursement of the appellants was properly denied. The decree appealed from, so far as relates to a monthly salary paid to a 'bookkeeper,' is accordingly affirmed," the court amended the opinion by adding after the word "affirmed" the additional words "with leave, however, to the trustees, if they so desire, to amend the accounts filed to include compensation paid by them to the person occupying the position of bookkeeper during the accounting period for services rendered by her other and in addition to that of bookkeeping, to the reimbursement of which said trustees may be legally entitled."

Clerk hire: I deem it unnecessary to detail the items involving clerk hire with which the trustees were surcharged, nor do I deem it necessary to enter into a discussion of the clerical services involved. In my opinion none of the services required skill and experience not pos-

sessed by the ordinary trustee. The argument that the operation of a typewriter is beyond the skill and experience of the ordinary trustee may be disposed of similarly as the same contention made in respect to bookkeeping machines.

Whether or not a fiduciary is entitled to reimbursement for clerk hire is determined in my opinion by the same test applied to the expense of keeping the books of account of the trust. The only difference is that, whereas, the test applied in respect to bookkeeping is predicated upon the specific legal duty on the part of the trustees to keep regular and accurate books of account, the same test when applied to the expense of clerical hire is predicated upon the general duties that may be expected of the ordinary trustee in the execution of the trust.[5] Of course the same qualification in respect to skill and experience applies to both.

By the thirteenth paragraph of the will of the testatrix, it is provided: "I give, devise and bequeath all of the rest, residue and remainder of my estates real and personal, wherever situated unto the trustees below named * * * to hold upon the following trusts, namely: to erect and maintain in the Hawaiian Islands two schools * * * to be known as, and called the Kamehameha Schools. I direct my trustees to expend such amount as they may deem best * * * in the purchase of suitable premises, the erection of school buildings and in furnishing the same with the necessary and appropriate fixtures, furniture and apparatus. I direct my trustees to invest the remainder of my estate in such manner as they may think best, and to expend the annual income in the maintenance of said schools; meaning thereby the salaries of teachers, the repairing of buildings and other incidental expenses * * * ." By the seventeenth article of the first codicil to the will

---

[5] *Estate of McBryde*, 8 Haw. 472 (1892).

of the testatrix, it is provided: "I give unto the trustees. named in my will the most ample power to sell and dispose of any lands or other portion of my estate, and to exchange lands and otherwise dispose of the same; and to purchase land, and to take leases of land whenever they think it expedient, and generally to make such investments as they. consider best; but I direct that my said trustees shall not purchase land for said schools, if any lands come into their possession under my will, which in their opinion may be suitable for such purpose; and I further direct that my said trustees shall not sell any real estate, cattle, ranches, or other property, but to continue and manage the same, unless in their opinion the sale may be necessary for the establishment or maintenance of said schools, or for the best interest of my estate."

The trustees contend that by the language quoted the testatrix intended that the net income of the trust estate, after the payment of all costs and charges of its management, should be made available and be expended for the continued support and maintenance of the schools, and that hence the necessary and reasonable expenses of management, including bookkeeping and clerk hire, are proper charges against the gross income of the estate.

The word "income" as employed in the will unquestionably means net income. But against gross income may be charged only those items of expense which are legally chargeable. The word "maintain" is defined in the will and includes only those expenses incidental to the maintenance of the schools. The meaning of the word "manage" construed in connection with powers granted trustees has a legal significance well-appreciated and understood.[6] Neither by the use of the words referred to nor by any of the other terms or provisions of the will may there be attributed to the testatrix an intention to provide

---

6 *Campbell* v. *Kawananakoa*, 31 Haw. 500.

a different rule of compensation than that legally applicable to fiduciaries where the instrument creating the trust is silent upon the subject. At the respective times of the execution of the will and codicils of the testatrix, the provisions of section 1281 of the Civil Code of 1859 providing for the fees of executors, administrators and guardians were applied by analogy to trustees.[7] Then and since, up to the amendment of 1927, the substantive rule of law obtained that where the instrument creating the trust is silent upon the subject of compensation, the trustee, nevertheless, is entitled to compensation for his services rendered in the execution of the trust, the determination of the amount thereof being committed to the appropriate court having jurisdiction over trusts. It is not unreasonable to assume that the testatrix purposely and intentionally made no provision for the compensation of her trustees, deeming the applicable statutory provisions in that regard to be ample and relying upon their terms to sufficiently recompense her trustees for services to be rendered by them.

Section 1281 of the Civil Code of 1859 contained a provision for the reimbursement of the fiduciaries named therein for their "actual expenses as the judge or court shall deem just and reasonable." The text of the section has been heretofore quoted.[8] To what extent fiduciaries under the statute were entitled to reimbursement "for their actual expenses" under the statute need not be decided. As hereafter pointed out, the section has been amended so that the provision for reimbursement of actual expenses was deleted. But it must be also assumed that the testatrix appreciated that the statute applicable to trustees' commissions was subject to legislative amendment and that amendments might be effected upon the in-

---

[7] *In re Estate of Lunalilo,* 13 Haw. 317.

[8] Note 2.

stigation of the trustees as well as others. The action of the last legislature is an instance in point.

Considerable evidence was adduced by the trustees to the effect that the original trustees were men of affairs and that it certainly could not have been the intention of the testatrix that they perform the actual clerical work of the administration of the trust. The language of the will is clear and unambiguous and neither artificial rules of construction nor extrinsic evidence can alter its plainly expressed terms and provisions.

The local statute fixing the compensation of fiduciaries is *sui generis.* Its counterpart does not exist elsewhere. Its construction lies in its own terms and provisions construed in the light of its legislative and juridical history.

Not only do the applicable provisions of section 3793 explicitly and implicitly provide that the commissions allowed trustees are by way of compensation in full for all services that are ordinarily performed by trustees in the execution of their trusts but this court has in effect so held in cases where that phase of the construction of the statute has been directly or indirectly involved.

The statute explicitly provides that the "fees and expenses" of trustees be the commissions on principal and income therein provided. Section 3793, as amended, is not one confined to the subject of compensation of or allowances to fiduciaries alone. On the contrary, the statute refers to the costs in probate courts and is subdivided into subdivisions with appropriate headings of the subject matter to which each subdivision refers, *viz.*: "Schedule." "Fees and expenses of executors, administrators, trustees and guardians"; "Fees of commissioners and appraisers"; and "High sheriff's or sheriff's fees"; and is *in pari materia* with all of the sections included in chapter 108 upon the subject of costs in the district, circuit and supreme courts and the respective officers thereof, including attorneys,

high sheriffs, sheriffs or police officers, executors, administrators, trustees and guardians, and commissioners and appraisers. The headings of these subdivisions are not to be confused with head notes expressing the substance of the subdivision but are an integral part of the subdivision itself. If they were omitted the subdivision would be textually incomplete.

These subdivisions with their respective headings were carried forward from the original Act of 1848 into the several compilations in which, as originally enacted or as subsequently amended, they appear. In the original Act the provision pertaining to compensation and allowances to fiduciaries was headed "Fees of Executors, Administrators and Guardians." This was repeated in the Civil Code of 1859, the Compiled Laws of 1884, the amendatory Act of 1893, the Civil Laws of 1897, and Revised Laws of 1905. But in the compilation of 1915 (§ 2542) the word "expenses" was added to the heading, so as to read: "Fees and expenses of executors, administrators and guardians," and in 1927, when the statute was amended[9] to include trustees and to make provision for allowances for special services, the heading appearing in the revision of 1915 was adopted by the legislature and the heading in the amendatory Act reads: "Fees and *expenses* of executors, administrators, trustees and guardians," and in that form was carried into the succeeding compilation (1935). (Emphasis supplied.) Moreover, the commissions are implicitly by way of compensation for and reimbursement of all services performed by the fiduciary personally or by his agents. The amount of the statutory commissions are fixed and absolute, irrespective of whether services involved in the execution of the trust are arduous or otherwise. The income from a single piece of improved real estate might equal in amount the aggregate income from

---

9 Sess. Laws 1927, Act 183, § 1.

a great number of less valuable properties, and the labor and expenses involved in the latter far exceed those of the former, yet the commissions are the same. No discretion is reposed in the court to adjust the fees to the risk and trouble involved. The amount of expense to be incurred in the employment of others to do his work is left to the fiduciary. His compensation covers such expense.

As heretofore pointed out, the original statute relative to compensation of executors, administrators and guardians permitted allowances for their actual expenses as deemed just and reasonable by the judge or court having jurisdiction over the accounts. Though, prior to the amendment of 1927, compensation of trustees was upon a *quantum meruit*, the statute applicable to executors, administrators and guardians was applied to trustees by analogy. The extent to which trustees are entitled to reimbursement for their actual expenses within the meaning of the statutory provision referred to requires no discussion. We may even assume *arguendo* that by its terms the trustees were not required personally to perform clerical services and that the salaries of clerks were allowable expenses against the estate. But in 1893 the Hawaiian Legislature amended section 1281 of the Civil Code of 1859[10] by deleting the provision in respect to expenses. Otherwise, the statute remained substantially the same. The fact of deletion indicates a legislative intent to discontinue allowance to trustees of expenses which required express statutory authority for their reimbursement. The legal effect of the deletion was to exclude allowance for the expense of the performance by others of delegable duties which the trustees were required by law to perform themselves.

The construction placed upon the statute by the trustees is the same as though the deletion had not been made.

---

10 Laws 1893, c. 98, § 1.

This is contrary to the presumption arising from a legislative amendment of a statute. Presumably the legislature intended to make a change. Of course it could not by the deletion affect the common-law right of a trustee to be reimbursed for expenses necessarily incurred in the administration of the trust, considered as expenses of the trust. While as a general rule, in the absence of express provision to the contrary, a trust estate must bear the expenses of its administration,[11] where provision is made for the compensation of a trustee, a trust is not liable for the services of others employed by the trustees to perform services which the trustees are ordinarily expected to perform themselves. The expenses of such services are not expenses incurred in the care, management and settlement of the estate but are the trustees' own expenses. I agree with counsel for the trustees that even in the absence of statutory provision therefor, expenses incurred in the administration of the trust as expenses of the trust are properly chargeable against the trust estate, but the expenses for which trustees are impliedly entitled to reimbursement do not include the trustees' own expenses for the performance by others of services which they should personally perform themselves. The Restatement of the Law of Trusts observes the distinction: "The trustee can properly incur expenses which are necessary or appropriate for performing his duties as trustee. Thus, he can properly incur expenses necessary or appropriate to get in the trust property, or to preserve it, or to make the trust property productive, or to perform any other duties which he may have as trustee." Restatement, Trusts § 188, p. 491, Comment a. "The trustee can properly incur expenses in employing attorneys, brokers or other agents or servants so far as such employment is reasonably necessary in the

---

11 *Meddaugh* v. *Wilson*, 151 U. S. 333; *Trustees* v. *Greenough*, 105 U. S. 527.

administration of the trust. He cannot properly incur expenses, however, in employing agents to do acts which the trustee ought personally to perform, as where it would be an improper delegation of his duties or powers to act through an agent, * * * or where although it would not be an improper delegation to employ an agent yet the service of the agent is one which is covered by the trustee's compensation." Restatement, Trusts § 188, p. 492, Comment c.

In my opinion the reasons advanced by the trustees why they should not be required to perform any greater services than are usually performed by the directors of a mercantile establishment might be material where the statute fixing their compensation expressly allows reimbursement, but it has no application in a statute such as ours which is not alone silent upon the subject of the allowance of expenses but is the result of the amendment of a pre-existing statute which expressly made such allowance.

An additional reason for the conclusion here reached is the amendment of 1927. In addition to making the statute applicable to trustees *eo nomine*, it was further amended by the legislature of that year to provide "such further allowances may be made as the court shall deem just and reasonable for special services." Otherwise the statute, as amended by chapter 98 of the Laws of 1893, remained substantially the same except for an amendment made in 1909, which is immaterial to our consideration. This is the first time that any mention is made of special services. The implication that the statutory rates of commission covered all ordinary services is obvious. Additional allowances for special services by trustees had been recognized by the courts prior to the amendment. But the amendment furnishes the key to the intention of the legislature regarding the character of the services for

which the regular commissions were allowed. The only logical conclusion to be drawn from the terms and provisions of the statute fixing the compensation of trustees, construed in the light of its legislative history, is that the legislature intended that the fixed commissions allowed should be by way of full compensation for all services within the skill and experience of the ordinary trustee, reasonably necessary in the execution of the trust, and that the extent to which others should be employed to perform those duties which the trustee should personally perform himself lay with each individual trustee accordingly as he was willing or unwilling to absorb the expense of such outside employment.

The juridical history of the statute is also conformative. This court has construed the statute as requiring the fiduciary to perform all services reasonably necessary in the execution of the trust and not beyond the skill and experience possessed by the ordinary trustee.

In *Estate of A. Enos*, 18 Haw. 542, 549 (1908), this court said: "The amount paid for clerical assistance to the administrators was for making up their accounts, examining account books and reporting on an income tax statement.[12] Recognizing that under certain circumstances clerical assistance[13] for an administrator may be necessary and should be paid for by the estate, still the ordinary clerical work[14] must be performed, or paid for, by the administrator himself. One who becomes an administrator must perform the ordinary work of such or else decline to be appointed."

In *Estate of Wichman*, 27 Haw. 780, 784 (1924), this court said: "when a trustee who is also an attorney per-

---

[12] Apparently not within the skill and experience of the ordinary trustee.

[13] Same comment.

[14] Work within the skill and experience of the ordinary administrator.

forms necessary professional services on behalf of and for the benefit of the estate he is allowed reasonable compensation therefor in addition to the statutory commissions. The theory upon which such additional compensation is allowed is that the service *is a special or extraordinary one and is in addition to the service usually expected of the ordinarily careful and prudent trustee* for which the trustee should receive extra compensation." (Emphasis supplied.) This language was quoted with approval in *Smith* v. *Lymer, supra,* at 177 (1926). While it is true that in *Estate of Mary E. Foster,* 34 Haw. 376, this court considered what might be expected of the ordinary trustee from the standpoint of his specific common-law and statutory duties to keep regular and accurate books of account, the principle of law enunciated applies equally to clerk hire.

This court has always recognized the inherent right of a fiduciary to be reimbursed, in conserving the property of the estate,[15] for counsel fees and costs in bills for instructions or similar suits,[16] and counsel fees as between solicitor and client.[17]

The trustees take the further position that although our statute is silent upon the allowance to trustees for their reasonable expenses necessarily incurred in the administration of the trust, such provision is implied, and insist that due to the size of the business of the trust, the number of its accounts, the details involved, the volume of nondelegable duties, their own personal interests and present occupations, and the necessity of their also acting as trustees of the Bishop Museum Trust and the C. R. Bishop Trust, it is a physical impossibility for them, in addition

---

[15] *Estate of James Campbell,* 16 Haw. 512, 519 (1905).

[16] *Estate of S. Kaiu,* 17 Haw. 514 (1906); *Estate of Brown,* 24 Haw. 573, 577 (1918); *Valentin* v. *Brunette,* 26 Haw. 498 (1922); *Estate of Mary E. Foster,* 34 Haw. 376, 389 (1937).

[17] *Estate of Lalakea,* 26 Haw. 243 (1922); *Estate of Afong,* 26 Haw. 337 (1922).

to their other work, personally to keep the accounts of the trust.

It might be stated in passing that there is no provision contained in the will of the testatrix that the trustees of her estate must also act as the trustees of the Bishop Museum Trust or the C. R. Bishop Trust. Hence it is immaterial to a consideration of the issues in this case how the present trustees also happen to be the trustees of the Bishop Museum Trust or the C. R. Bishop Trust.

Further, it is immaterial to the issues in this case the extent to which the trustees of the Bishop Estate are diverted from the performance of those duties which they are required personally to perform, by other interests or other occupations.

Nor are the size of the business of the trust estate, the number of its accounts, the details involved, or the volume of nondelegable duties material if, as I believe, the compensation fixed by the statute is intended as compensation in full for all services, except special services, reasonably necessary in the administration of the trust estate and within the skill and experience of the ordinary trustee. The extent of the expense necessary for clerical services is entirely optional with the trustees accordingly as they decide to perform their delegable duties themselves or have them performed by others at their personal expense.

The provisions of the local statute allowing compensation to fiduciaries fix the amount absolutely upon a percentage basis, leaving no discretion to the court. It contains no provision allowing fiduciaries their necessary expenses in the care, management and settlement of the estate. While, as said before, the absence of such a provision does not necessarily mean that fiduciaries are not entitled to their necessary expenses in the care, management and settlement of the estate as such, it does not mean that the expenses of administration include expenses in-

curred in the employment of others to perform services which the fiduciary should perform himself. In other words, conceding the inherent right in the fiduciary to reimbursement for expenses incurred in the care, management and settlement of his estate as such, he is not entitled to reimbursement for clerical services which he is expected to perform himself and for which the statute allows him a fixed compensation.

Very little need be said upon the contention of the trustees that they are entitled to reimbursement for expenses necessarily incurred in the management of the trust property upon principles of equity. There is no principle of equity of which I am aware that may be invoked to enlarge the provisions of a statute to include that which, from its terms, is legally excluded.

In *Estate of F. Molteno*, 3 Haw. 288, an effort was made by the fiduciary to enlarge the scope of the provisions of section 1281 of the Civil Code of 1859 by including within the term "moneys" as used in the statute specific chattels transferred in kind. Mr. Justice Hartwell, in his concurring opinion, held that the court could not authorize anything to be paid the fiduciary beyond the sums fixed by the statute; that whatever policy might be best, it was for the legislature only to say and that the court should interpret the statute literally.

In construing the statute of Missouri which, similarly as our local statute, fixes the compensation of fiduciaries, the court in *Matson & May* v. *Pearson*, 121 Mo. App. 120, 97 S. W. 983, 990, had this to say: "Now, it is the well-settled rule with us that compensation of administrators and executors is not a matter within the discretion of the courts, but, on the contrary, is a matter fixed by the statute * * *, it is obvious that the statute with respect to the subject of commissions is to be strictly construed for the benefit and in the interest of the estate and that no

commissions are to be allowed * * * except they are earned within the spirit or letter of the statute."

A great deal of loose language is found to the effect that trustees are entitled to reimbursement of their necessary and reasonable expenses incurred in the administration of the trust as though necessity were the sole test of the right of reimbursement. The authorities cited, however, to support such statements depend for their rationale upon the statutes locally applicable.

Many cases were cited by the trustees containing language apparently supporting their contentions. These cases, however, are of little or no value, analyzed in the light of the respective statutes obtaining in the States from which they emanate. All of the State statutes to which I have had access, with the exception of those of Connecticut, Delaware, New Hampshire, Mississippi, Pennsylvania and South Carolina, where no general statutory provision for allowance of expenses exists, contain provisions more or less similar in form allowing fiduciaries their necessary expenses in the care, management and settlement of the estate.[18]

---

[18] "All necessary expenses in the care, management and settlement of the estate." 3 Ariz. Code Ann. (1939) § 38-1402; Cal. P. Code (Deering, 1935) § 900; 2 Idaho Comp. Stat. (1919) § 7688; 23 Mich. Stat. Ann. (1938) § 27.3107; 2 Minn. Stat. (Mason, 1927) § 8788; 4 Mont. Rev. Code Ann. (1935) § 10285; Neb. Comp. Stat. (1929) § 30-1410; Nev. L. (1941) c. 107, § 206; 2 N. D. Comp. L. Ann. (1913) § 8821, as am. in Supp. to Comp. L. Ann. (1913-1925) § 8821; 1 Okla. Comp. Stat. Ann. (Bunn, 1921) § 1321; 1 Ore. L. (Olson, 1920) § 1290; 2 S. D. Code (1939) § 35.1603; Vt. Pub. L. (1933) § 2819; 1 Wash. Comp. Stat. (Rem., 1922) § 1526; Wis. Stat. (1941) § 317.08; Wyo. Rev. Stat. Ann. (1931) § 88-2606; "* * * and the court may also allow actual expenses," Ala. Code Ann. (1928) art. 20, § 5923; entitled upon accounting to "credit himself with all sums of money lawfully expended in settling such estate either by the payment of debts or otherwise," Ark. Dig. Stat. (Crawford & Moses, 1921) c. 1, § 182; "such additional allowance for cost and charges, in collecting, defending and preserving the estate and disposing of the same, as shall be reasonable," 4 Colo. Stat. Ann. (1935)

: ·In each instance, however, where the statute allows expenses in the care, management and settlement of the

c. 176, § 232; "all reasonable charges on account of * * * and in the administration of the estate of the person deceased," Fla. Comp. Gen. L. (1927) § 5541; "Among the expenses of administration shall be included * * * the expenses of * * * agents," Ga. Code (1933) §.:113-2009; "such additional allowances for costs and charges in collecting and defending the claims of the estate and disposing of the same as shall be reasonable," Ill. Rev. Stat. (Cahill & Moore, 1935) c. 3, § 135; "including expenses in the discharge of his duties," 3 Ind. Stat. Ann. (Burns, 1933) § 6-1416; "Such further allowances as are just and reasonable may be made by the court * * * for actual necessary and extraordinary expenses," Iowa Code (1939) c. 509, § 12065; "his necessary expenses incurred in the execution of his trust," Kan. 1941 Supp. to Gen. Stat. (1935). § 59-1717; (re extraordinary services) "expenses incurred in protecting, attending to, collecting and settling such estate," Ky. Stat. Ann. (Carroll, 1930) § 3883; "and trustees may receive yearly such additional sum for the care and management of the trust property as the court having jurisdiction of said trust shall allow," Me. Rev. Stat. (1930) c. 75, § 43; "costs and extraordinary expenses (not personal) which the court may think proper to allow, laid out in the recovery or security of any part of the estate," 2 Md. Ann. Code (Bagby) art. 93, § 5, am. Md. L. (1939) c. 511; "his reasonable expenses incurred in the execution of his trust," 2 Mass. Gen. L. (1932) c. 206, § 16; "court costs," 1 Miss. Code Ann. (Hemenway, 1917) §§ 666-668; "attorney fees," id. § 1799; "all reasonable charges for * * * service, and collecting and preserving the estate," 1 Mo. Rev. Stat. (1939) § 220; "reasonable sum for necessary charges and disbursements in the management of the estate," 1 N. C. Consol. Stat. Ann. (1919) c. 1, § 157; am. N. C. L. (1941) c. 124, p. 207; "over and above their actual expenses," 1 N. J. Rev. Stat. (1937) § 3:11-2, am. L. (1939) c. 134; "just, reasonable and necessary expenses," N. Y. Surr. Ct. Act, L. (1920), c. 928, § 285, am. L. 1921, c. 440, L. 1923, c. 649, L. 1934, c. 892, L. 1936, c. 202, and L. 1938, c. 593; "necessary expenses," N. M. Stat. Ann. (1929, comp.) § 47-702; "just and necessary expenses," 2 Ohio Gen. Code Ann. (Page, 1926) § 10830; "all reasonable and proper charges * * * made by them * * * in the execution of their trust," R. I. Gen. L. (1938) c. 580, § 6; "such disbursements as he [fiduciary] supports by lawful vouchers," Tenn. Code (1932) § 8250; "all reasonable expenses necessarily incurred by them in the preservation, safe-keeping and management of the estate," 9 Texas Rev. Civ. Stat. Ann. (Vernon, 1925) art. 3691; "his proper expenses," Utah Rev. Stat. Ann. (1933) § 102-11-24 (trustees § 102-12-32); "any reasonable expenses incurred by him as such," Va. Code Ann. (1924) § 5425; W. Va. Code Ann. (Barnes, 1923) c. 87, § 17.

estate, there is, except in the States of Ohio and Vermont, an accompanying provision either in the same or in another statute *in pari materia* containing express provisions for the compensation of fiduciaries for their services as such.

The statutes of other jurisdictions dealing with the compensation of trustees may be grouped into two general categories: those fixing the amount absolutely, usually upon a percentage basis and reposing no discretion in the court, and those where the amount of compensation is entirely within the discretion of the court, with or without limitation as to the maximum. And as the amount of compensation is fixed and absolute on the one hand or in the sole discretion of the court on the other, whether with or without limitation, the statutes allowing expenses for the care, management and settlement of the estate are construed accordingly.

In the State of New York the compensation of fiduciaries is fixed absolutely, computed upon a percentage basis, leaving no discretion in the court.[19] In that State the courts, while adhering to the general rule applicable to allowance of expenses, have construed the statute in that regard as entitling fiduciaries to reimbursement of the expense of clerical help, including bookkeepers, where

---

[19] This is also true in 3 Ariz. Code Ann. (1939) § 38-1404 (different rule for trustees, *id.* § 38-1510); Cal. P. Code (Deering, 1935) § 901; Ga. Code (1933) § 113-2001; 2 Idaho Comp. Stat. (1919) § 7690; 23 Mich. Stats. Ann. (1938) § 27.3107; 1 Mo. Rev. Stat. (1939) § 220; 4 Mont. Rev. Code Ann. (1935) § 10287; Neb. Comp. Stat. (1929) § 30-1411, am. Neb. L. (1939) c. 31, p. 166; Nev. L. (1941) c. 107, § 207; N. M. Stat. Ann. (1929 comp.) § 47-701; 2 N. D. Comp. L. Ann. (1913) § 8822; 1 Okla. Stat. Ann. (Bunn's comp., 1921) § 1323; 1 Ore. L. (Olson, 1920) § 1292; 3 S. C. Code of L. (1932) §§ 9017, 9048; 2 S. D. Code (1939) § 35.1603; 9 Texas Rev. Civ. Stats. Ann. (Vernon, 1925) art. 3689; Utah Rev. Stat. (1933) § 102-11-25 (compensation of trustees in discretion of court); Wis. Stat. (1941) § 317.08; and Wyo. Rev. Stat. Ann. (1931) § 88-2607.

under the peculiar circumstances involved such clerical assistance becomes necessary.[20] The citations given include those cases cited by the trustees.

---

[20] The Laws of New York (1817, p. 292) quoted *In the Matter of Roberts, a Lunatic*, 3 Johns. Ch. 42 (1817), consolidated in II Rev. Stat. N. Y. (1836, 2d ed.) pt. II, c. 6, tit. III, art. 3, § 58, allowed fiduciaries compensation computed at fixed rates upon the moneys of the estate received and paid out "over and above their expenses." By the Surrogate's Act of 1920, cited *supra* note 18, as originally enacted and as subsequently amended, the compensation allowed fiduciaries was in addition to their "just, reasonable and necessary expenses." These statutes have been construed as authorizing a fiduciary to employ a clerk or agent. *Lent et al.* v. *Howard et al.*, 89 N. Y. 169 (1882); a rent collector, *Wells* v. *Disbrow*, 20 N. Y. Supp. 518 (1892); *In re Binghampton Trust Co.*, 83 N. Y. Supp. 1068 (1903); *Garvey* v. *Owens*, 12 N. Y. Supp. 349 (1890); a bookkeeper, *Merritt* v. *Merritt*, 53 N. Y. Supp. 127 (1898); an accountant, *Matter of Chapal*, 269 N. Y. 464, 199 N. E. 762 (1936); a stenographer, *In re Hammer*, 160 N. Y. Supp. 191 (1916); a manager of an apartment house, *In re Grunhut's Will*, 277 N. Y. Supp. 454 (1935); and entitling fiduciaries to reimbursement for traveling expenses, *In re M'Dowell*, 163 N. Y. Supp. 164 (1916); *In re Rohr's Estate*, 260 N. Y. Supp. 181 (1932). But the general rule in New York is that "administrators, executors, and trustees are not only bound to assume the responsibilities and exercise the discretions of their office, but must also perform within reasonable limits, the actual manual labor requisite to the due execution of the trust." *In re Harbeck*, 30 N. Y. Supp. 521 (1894). "Personally perform, or at his own expense provide for the performance of all clerical duties incident to the administration." *In re Hammer, supra*; see also *In re M'Dowell, supra.* The rationale of all the cases cited is that the employment of additional assistance is necessary under the peculiar circumstances obtaining in each individual case. For instance, the employment of a clerk or agent "when from the peculiar nature and situation of the property, the services of a clerk or agent are necessary." *Lent et al.* v. *Howard et al., supra.* The employment of a rent collector where the same is not "shown to be either wasteful or extravagant, in view of the character of the property," *Wells* v. *Disbrow, supra*; the employment of a bookkeeper where the "testamentary scheme of distribution involves the keeping of numerous complicated accounts, extending over a considerable period," *Merritt* v. *Merritt, supra*, but the employment of an accountant to write up and audit books disallowed where the entries were few in number, *In re Harbeck, supra.* Necessity is also governed by the ability of the trustee. "Undoubtedly there are many instances where the necessary expense of employing clerks and bookkeepers should be

Cases cited by the trustees construing statutes similar to the New York statute are to the same effect.[21]

On the other hand in New Jersey compensation of fiduciaries is in the discretion of the court having jurisdiction of their accounts, within statutory maximum lim-

---

allowed * * * . Indeed, the courts have been careful not to insist that so much clerical work should be either personally performed by an administrator, * * * or paid for by him, as to make the acceptance of such a position impossible without considerable personal loss. Care has also been observed to limit the authorization of such expenditures * * * to cases where employment of assistance seems a matter of necessity, and not to so extend it as to create the impression that the only duty which the law devolves upon such an officer is to employ persons to perform all the various duties necessary to the conduct of the trust undertaken. * * * It is true that the * * * trustees are men of large affairs, and accustomed to employ men to keep their books * * * . But their practice in such respect cannot be accepted as the guide for the court. The fact that they are busy men, and have not as much time to give to the management of estates as other individuals, cannot be permitted to affect the legal rule, * * * touching the propriety or legality of the expenditure * * * ." *In re Harbeck, supra;* see also *In re Ogden's Estate,* 83 N. Y. Supp. 977. "The general rule is that an administrator must personally perform, or at his own expense provide for the performance of, all clerical duties incident to the administration." *People* v. *Prendergast,* 152 N. Y. Supp. 938, *aff'd* 217 N. Y. 604, 111 N. E. 1096. Trustees are not entitled to extra compensation for running a business. *In re Popp,* 107 N. Y. Supp. 277; *In re Hopson's Will,* 211 N. Y. Supp. 128; *In re Gorra's Will,* 236 N. Y. Supp. 709; *In re Kempf's Estate,* 104 N. Y. Supp. 585. The allowance of traveling expenses where the property from which the income is collected is at a distance from the home or place of business of the fiduciary. *In re Rohr's Estate, supra.*

21 Allowing expenses in the operation of a farm by the trustee including services performed, boarding help, raising and harvesting a crop of hops, *Ranzau* v. *Davis,* 85 Ore. 26, 165 Pac. 1180; expenses allowed, including traveling expenses, taxi hire, commissions on sales of real estate and collection of ordinary and farm rent, *Stewart* v. *Baxter,* 145 Ore. 460, 28 P. (2d) 642; counsel fees, *Vanderbilt University* v. *Mitchell,* 162 Tenn. 217, 36 S. W. (2d) 83, 86; charge of agent for collection of rents, *Estate of Whitney,* 78 Cal. App. 638, 248 Pac. 754, 758; traveling expenses and bookkeeping, *Wise* v. *Cutchall,* 41 P. (2d) 864 (Okla.); traveling expenses, *Holland* v. *Doke,* 135 Ark. 372, 376.

its.[22] Courts of that State indulge in considerable latitude in the allowance of expenses for clerical assistance. This indulgence is exercised apparently upon the theory that to the extent that expenses are for services which the fiduciary should perform himself, his compensation is correspondingly decreased.[23] The cases from New Jersey cited by the trustees are illustrative.[24]

[22] The same is true in Ala. Code Ann. (1928) art. 20, § 5923; Ark. Dig. Stat. (Crawford & Moses, 1921) c. 1, § 183; 4 Colo. Stat. Ann. (1935) c. 176, § 232; Fla. Comp. Gen. L. (1927) § 5541; Ill. Rev. Stat. (Cahill & Moore, 1935) c. 3, § 135, re trustees c. 148, § 35; 3 Ind. Stat. Ann. (Burns, 1933) § 6-1416; Iowa Code (1939) c. 509, § 12063; Kan. 1941 Supp. to Gen. Stat. (1935) § 59-1717; Ky. Stat. Ann. (Carroll, 1930) § 3883; Me. Rev. Stat. (1930) c. 75, § 43; 2 Md. Code (Bagby) art. 93, § 5, am. Md. L. (1939) c. 511; 2 Mass. Gen. L. (1932) c. 206, § 16; 2 Minn. Stat. (Mason, 1927) § 8788; 1 Miss. Code Ann. (Hemenway, 1917) § 1798; 1 N. C. Consol. Stat. Ann. (1919) c. 1, § 157, am. N. C. L. (1941) c. 124, p. 207; 2 Ohio Gen. Code Ann. (Page, 1926) § 11034; R. I. Gen. L. (1938) c. 580, § 7; Tenn. Code (Williams, 1932) § 8250; Va. Code (1924) § 5425; 1 Wash. Comp. Stat. (Rem., 1922) § 1528; and W. Va. Code Ann. (1923) c. 87, § 17.

[23] *Dey* v. *Codman*, 39 N. J. Eq. 258, 265; *Babbitt* v. *Fidelity Trust Co.*, 72 N. J. Eq. 745, 66 Atl. 1076, 1079; *Metcalfe* v. *Colles*, 43 N. J. Eq. 148, 10 Atl. 804, 807; *Lyon* v. *Bird*, 79 N. J. Eq. 157, 80 Atl. 450, 452.

[24] Agents, collectors, accountants and other persons properly employed in similar affairs. *Parker* v. *Johnson*, 37 N. J. Eq. 366, 367 (cited in 2 Scott, Trusts § 188.3, p. 1004, n. 1). Commissions for collection of rents. *In re van Riper's Estate*, 107 Atl. 55 (N. J.). Expenses of keeping estate's accounts and records, maintaining office and railroad fares traveling between office and home. *In re Linn*, 124 N. J. Eq. 65, 199 Atl. 396. The case of *Hagedorn* v. *Arens*, 106 N. J. Eq. 377, 150 Atl. 4 (cited in 2 Scott, Trusts § 244, p. 1407, n. 8, see § 188.3, n. 1), involved counsel fees in connection with apportionment of stock dividends between remaindermen and life tenants and apportioning payments and expert advice in making income tax returns. *In re Megargee*, 117 N. J. Eq. 347, 175 Atl. 808, counsel fees; *Babbitt* v. *Fidelity Trust Co.*, 72 N. J. Eq. 745, 66 Atl. 1076, cited *supra* note 23 at 1079, commissions on sales of real estate, attorneys fees and court costs on bill for instructions; *Brown* v. *Brown*, 72 N. J. Eq. 667, 65 Atl. 739, commissions upon sale of real estate. None of these cases is pertinent upon this point. The case of *Hayes* v. *Atlantic City*, 151 Atl. 210 (N. J.), involved a construction of the civil service statute and is not in point.

Cases cited by the trustees construing statutory provisions allowing fiduciaries their expenses in the care, management and settlement of the estate where the accompanying statute allowing compensation commits the amount to the discretion of the appropriate court with or without limitation, apparently follow the same theory as adopted by the courts of New Jersey, construed in the light of the decisions in *Dey* v. *Codman, Babbitt* v. *Fidelity Trust Co., Metcalfe* v. *Colles,* and *Lyon* v. *Bird,* all cited *supra* note 23.[25]

In Connecticut, Delaware, New Hampshire and Pennsylvania, where no statutory provision exists for compensation of fiduciaries, or reimbursement for their expenses incurred in the care, management and settlement of estates, compensation is allowed by the respective courts having jurisdiction of settlement of the estate accounts under their inherent equitable powers and the amount of compensation is based upon the reasonable value of the services rendered, including expenses in the care, management and settlement of the estate.[26] No case has been called to our attention and personal research has failed to develop any case from those States where fiduciaries have been allowed expenses for bookkeeping or clerk hire.

[25] *Overman* v. *Lanier,* 157 N. C. 544, 73 S. E. 192, 194; accountant, *Wolfe's Case,* 34 N. J. Eq. 223; counsel fees, *Kingsland* v. *Scudder,* 36 N. J. Eq. 284, 286; *In re Megargee,* 117 N. J. Eq. 347, 175 Atl. 808, 809, 810; expense of safe deposit box, *Hartson* v. *Elden,* 58 N. J. Eq. 478, 44 Atl. 156, 158; expense of examination of testator's effects, *In re Wiley's Estate,* 65 Atl. 212, 214 (Prerog. Ct., 1906).

[26] Expenses of the care and conservation of the property of the estate as such. See *Clark* v. *Platt,* 30 Conn. 282 (details of expenses undisclosed); traveling expenses (details undisclosed), *Main's Appeal,* 73 Conn. 638, 645; *In re Estate of Harold P. Walker,* 13 Del. Ch. 439, 122 Atl. 192, 194 (expenses of auto, carfare and telephone incurred in the conservation of the personal property of the estate); *Tuttle* v. *Robinson,* 33 N. H. 104, 118 (per diem allowance for attendance at court in the matter of the estate).

All of the courts of the States referred to observe the distinction between ordinary services which a fiduciary is expected to perform himself and the services which are beyond the skill and experience possessed by the ordinary fiduciary.[27]

---

[27] *Dent* v. *Foy*, 214 Ala. 243, 107 So. 210; counsel fees and fees paid tax expert, *Hagedorn* v. *Arens*, 106 N. J. Eq. 377, 150 Atl. 4, and *In re Megargee*, 117 N. J. Eq. 347, 175 Atl. 808, both cited *supra* note 24; *Lindsay* v. *Richardson Estate*, 98 Mich. 319, 57 N. W. 171, 172; counsel fees, *Vanderbilt University* v. *Mitchell*, 162 Tenn. 217, 36 S. W. (2d) 83, 86, cited *supra* note 21; *Meddaugh* v. *Wilson*, 151 U. S. 333, cited *supra* note 11.